**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

PERLA ENRIQUEZ BACA, as the Personal
Representative of AMELIA BACA, deceased,

      Plaintiff,

v.                                                                             No. 2:22-cv-0552 RB/GJF

JARED COSPER, in his individual capacity,
THE CITY OF LAS CRUCES, and LAS CRUCES
POLICE CHIEF MIGUEL DOMINGUEZ,

      Defendants.

<u>**MEMORANDUM OPINION AND ORDER**</u>

On April 13, 2022, Las Cruces Police Department (LCPD) Dispatch radioed officers about

a 911 call regarding a female subject armed with a knife. The 911 caller stated that the female was

threatening to kill her and was stabbing at the floor with the knife. LCPD Officer Jared Cosper

was the first officer to respond. Just prior to arriving at the home, Cosper learned that Dispatch

could hear a child crying on the line but that the caller had stopped talking.

Cosper's Body-Worn Camera (BWC) recorded the events. Cosper announced his presence

at the entryway of the home, and two women quickly exited. Decedent Amelia Baca stepped into

view and stood in the front room of the home eight to ten feet away from Cosper. Baca held kitchen

knives, one in each hand, and Cosper immediately drew and pointed his firearm at her.

What followed was brief and chaotic: Cosper repeatedly yelled at Baca to put the knives

down, the two women frantically pleaded with Baca, and Baca talked back and shook her head no.

Thirty-nine seconds after Cosper first encountered Baca, she took two steps toward him, knives in

hand, and he fired two shots, hitting her in the chest. Baca died from the gunshot wounds.

Perla Enriquez Baca, as Baca's Personal Representative, now brings suit against Cosper,

LCPD Chief Miguel Dominguez, and the City of Las Cruces for violations of Baca's constitutional rights. Before the Court is Cosper's Motion for Partial Summary Judgment on the Basis of Qualified Immunity as to Counts I and II. (Doc. 25.) As discussed below, Cosper is entitled to qualified immunity as to Count I because Plaintiff fails to demonstrate a constitutional violation or that the law was clearly established that Cosper's conduct would violated Baca's right to be free from excessive force. Plaintiff concedes that Count II should be dismissed. Thus, the Court will **grant** Cosper's motion for summary judgment.

## I.      Statement of Facts[1]

### A.      The Incident

On April 16, 2022, at approximately 6:38 p.m., Cosper, an officer with the LCPD patrol division, was on duty with his K-9 dog. (Doc. 25-C ¶¶ 1, 4, 10 (citing Doc. 25-C-2 at 9–10).) Cosper heard a radio transmission from LCPD Dispatch "regarding a call about a 'behavioral issue' at 825 Fir Avenue in Las Cruces." (*Id.* ¶ 4.) Dispatch stated that a female subject, armed with a knife, was stabbing at the floor with the knife and threatening to kill the reporting party. (*Id.* ¶ 11.) The reporting party "was barricaded in a room of the house with a child." (*Id.* (citing Doc. 25-B at 9:16–38).) Cosper later learned that there was a second child sheltering in another room without an adult. (*See* Doc. 25-C-2 ¶ 24.)

Cosper radioed that he was en route to the address. (*See id.* ¶¶ 12–16.) When he approached the house, he saw two women walking into what he believed to be 825 Fir Avenue. (*Id.* ¶¶ 17–18.) Before he exited his vehicle, he learned that the 911 operator could hear a child crying, but the

---

[1] In accordance with summary judgment standards, the Court recites all admissible facts in a light most favorable to Plaintiff. Fed. R. Civ. P. 56; *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). The facts are undisputed unless noted.

caller was no longer speaking. (*Id.* ¶¶ 19–20 (citing Doc. 25-C-2 at 2).) Cosper activated his BWC before he exited the vehicle. (*See* Doc. 25-A.)

LCPD Policy General Order 245.04, which provides guidelines and procedures for officers assisting a mentally ill person, outlines certain responses that "may be taken" in such situations, including:

> 1. Ensure that backup officers are present before taking any action.
> 2. If possible, try to obtain any information on the subject from family or friends.
> 3. Attempt to calm the situation:
>    a. Cease emergency lights and sirens if practical. . . .
>    c. Approach the person in a quiet, non-threatening manner. . . .
>    e. Move slowly, being careful to avoid exciting the person.
>    f. Use appropriate communication to . . . [p]rovide reassurance that the police are there to help and that appropriate care will be provided[ and to a]ttempt to find out what is bothering the person. . . .
>    i. Do not threaten the person with arrest or physical harm.

(Doc. 32-2-A at 8–9.)

Cosper saw that he was the first officer to respond and that Emergency Medical Services personnel had not arrived. (*Id.* ¶¶ 21–22.) Cosper attested that "[i]t was not consistent with [his] training as a patrol officer to wait for backup in" such a situation: *i.e.*, where Dispatch "was reporting an individual was armed with a deadly weapon, threatening to kill other occupants," which "included a child who was not sheltering with an adult, and the individual was physically acting out stabbing motions with a knife." (*Id.* ¶ 24.) As Cosper approached the front door of 825 Fir, he heard a metal tinging sound, which he believed to be the subject "acting out with a knife." (*Id.* ¶¶ 26–27; *see also* Doc. 25-A at 01:14.) Consequently, Cosper, who was not wearing a "stab proof" vest, unholstered his firearm. (Doc. 25-C ¶¶ 28–29 (citing Doc. 25-C-4).)

Cosper stepped into the entryway and could see two figures standing inside the home through a screen door. (*Id.* ¶ 32.) He could hear people inside talking but could not hear what was

being said. (*Id.* ¶ 33.) He announced his presence and asked the people to step outside. (Doc. 25-A at 01:19–21.) Two women immediately exited through the front door, leaving the screen door open with a view of the front room. (*See id.* at 01:22–26; *see also* Doc. 25-C ¶¶ 35–38.) As the women quickly and quietly exited the house, the first said something indistinguishable in a low voice; the second quietly said "please be very careful with her." (Doc. 25-A at 01:22–26.) Cosper recalls that the "second woman's tone of voice and her hurried manner made it sound like she was passing along a quick warning to me to watch an individual inside the house and that she (this second woman) wanted to get out of there quickly." (Doc. 25-C ¶ 44.) Cosper thought these women may have been the same individuals he had seen on the street walking toward the home and believed that "the safety of the 911 caller and other occupants was likely still at risk." (*Id.* ¶ 40.)

Once the women exited, Baca stepped into view in the open doorway, approximately ten feet away from Cosper. (Doc. 25-A at 01:26–27; *see also* Doc. 25-C ¶¶ 46–47, 62.) When Cosper saw that Baca held a knife in her left hand, he raised his right arm, pointed his firearm at Baca, and yelled at her in a loud voice to "set it down. Set it down, now!"[2] (*See* Doc. 25-A at 01:26–28; *see also* Doc. 25-C ¶¶ 48–49.) Cosper saw Baca mouth the word "'No' without any hesitation." (Doc. 25-C ¶ 54; *see also* Doc. 25-A at 01:28–30).) He noticed that Baca held "a long-bladed knife" in her right hand as well. (Doc. 25-C ¶ 50; *see also* Doc. 25-A at 01:31.) Cosper did not believe that Baca was "confused as to who [he] was or what [he] was ordering her to do." (Doc. 25-C ¶ 51.) Cosper did not think that Baca "appear[ed] distraught[,]" rather he thought she "appeared angry that [he] was ordering her to put the knives down." (*Id.* ¶¶ 52–53.)

---

[2] Cosper kept his firearm pointed at Baca throughout the incident. (Doc. 25-A at 01:26–02:05.) Cosper also had a flashlight pointed at Baca for the entire interaction. (*See id.*) The light was generally pointed at and illuminated Baca's chest and occasionally moved up toward her neck. (*See id.*)

The two women were still present; Cosper felt them pressing against his right side and arm. (*See* Docs. 25-C ¶ 55; 25-C-6; *see also* Doc. 25-A at 01:27–32.) The women were both speaking, presumably to Baca, and the video shows them waving their hands and arms close to Cosper. (Doc. 25-A at 01:27–32.) Cosper twice ordered the women to back away and motioned them away with his left hand.[3] (*Id.* at 01:31–33 ("back up, back up"), 01:37–39 ("ok back up, back up now").) Cosper noticed that as he ordered the bystanders to back up the first time, "Baca turned her head to her right to look down at the floor behind her and stepped back in apparent compliance with" his order. (Doc. 25-C ¶ 64; *see also* Doc. 25-A at 01:31–33.) After Cosper repeated his order to back up, a second officer, Fierro, arrived on the scene and ordered the women to get back.[4] (Doc. 25-A at 01:43–44 (Fierro in the background ordering the bystanders to "get back"); *see also* Doc. 25-D at 00:46 (Fierro's BWC recording of the same event.)

Cosper testified that he could not clearly hear what either Baca or the women were saying "over the sound of [his] own voice, which was amplified in the narrow entry corridor. (Doc. 25-C ¶ 68.) Nor could he distinguish whether Baca was speaking English or Spanish. (*Id.* ¶ 72.) He does "remember hearing one of the women . . . say something to the effect that Ms. Baca had mental health issues" as he was ordering the women to back up.[5] (*Id.* ¶ 69.)

As Fierro forcibly moved the women several feet away from the door, Cosper continued to

---

[3] Plaintiff objects to Cosper's depiction of how the women interacted with him. (*See* Doc. 32 at 2.) The Court relies on the video evidence, rather than Cosper's assertions describing the video, to summarize the incident. Consequently, Plaintiff's objection is moot.

[4] It took Fierro approximately 11 seconds to push the women away from Cosper. (*See* Doc. 25-D at 00:46–57.)

[5] Plaintiff objects to UMF No. 43 on the basis that "it vaguely states 'at one point' one of the bystanders told him Ms. Baca was mentally ill." (Doc. 32 at 3 (discussing Doc. 25 at 8).) Plaintiff notes that in his recorded interview, Cosper "indicated he was told of Ms. Baca's mental health issues 'when [he] drew down on her,' which means he was told at the very beginning of the encounter." (*Id.* (quoting Doc. 32-1 at 16:20–50, 21:30–58).) The video provides the best evidence. Immediately before Cosper tells the women to back up for the second time, one of the women says, "she is mentally sick." (*See* Doc. 25-A at 01:33–38.)

order Baca to drop the knives. (*See* Docs. 25-A at 01:46–57; 25-D at 00:46–57.) Baca moved the knife from her left hand into her right hand and briefly turned to her right. (Doc. 25-A at 01:57–58.) Cosper ordered Baca to "put'em on the ground." (Doc. 25-D at 01:58.) Baca looked at him and motioned with her left hand downward. (*Id.*) She then took a step or two backward, her hands up around chest/shoulder height. (*Id.* at 01:59.) As Cosper continued shouting orders for Baca to put the knives down, Baca lowered her arms to her sides and waved her left hand several times toward the ground. (*Id.* at 01:59–02:03.) She still held the knives in her right hand. (*See id.*) Cosper believed that Baca "was motioning for [him] to lower [his] gun and that she was going to comply and set the knives down onto the sofa at the same time." (Doc. 25-C ¶ 88.) He thought that Baca "did not appear angry anymore; she appeared resigned as though she had decided to end the standoff."[6] (*Id.* ¶ 89.)

Cosper yelled again to "put it down now," gesturing with his left hand toward the ground. (Doc. 25-A at 02:04.) At that moment, Baca's expression changed, she straightened her stance, and she took two slow steps toward Cosper, closing the distance between them by several feet. (*Id.* at 02:04–05.) Cosper yelled "put the fucking knife—"; his left hand went up to his firearm, and he fired two shots, hitting Baca in the chest as she took a third step. (*Id.* at 02:05.) When Cosper fired at Baca, "her left foot was almost on the threshold" of the front door, approximately six to seven feet away from him. (*See* Doc. 25-C ¶¶ 94–102.)

Over the course of 39 seconds, Cosper issued 16 loud, clear commands to Baca to drop her

---

[6] Plaintiff disputes Cosper's recitation of the events in UMF Nos. 51–65 and argues that the video evidence could be interpreted to mean that Baca thought Cosper was pointing at the ground to communicate that she should move toward him. (*See* Doc. 32 at 3.) While the Court agrees that this is a valid alternative explanation for Baca's conduct, Plaintiff's assertion does not create a genuine dispute of fact regarding Cosper's impression of the events.

knives. (*See id.* at 01:26–02:05.[7]) Cosper fired at Baca approximately 14 seconds after Fierro moved the women away from his right side. (*See* Doc. 25-D at 00:57–01:12.) The two women spoke during the entire interaction, as did Baca, although in listening to Cosper's BWC video,[8] it is difficult or impossible to make out what the women are saying over Cosper's commands. (*See* Doc. 25-A at 01:26–02:05.)

Shortly after Cosper fired his weapon, he instructed Fierro to handcuff Baca and locate the knives, and Cosper entered the home to locate the other occupants. (*See id.* at 02:16–41; Doc. 25-C ¶ 106.) Cosper attests that he did not have the necessary medical equipment on him or in his police vehicle to render immediate first aid. (Doc. 25-C ¶¶ 109–13.) Officer Appelzoller, who arrived on scene only seconds after Cosper shot Baca, began first aid. (*See id.* ¶¶ 114–15..)

## B.    The Space

The entryway of the house was comprised of a small room or porch with one doorway that opened to the outside, a small wall to the right of the front door to the home, the front door itself, a wall opposite the open doorway, and another wall opposite the front door. (*See* Docs. 25-A at 01:12–23; 25-C-5.) A floor-to-ceiling green tarp was attached to the small wall on the right of the outside door. (*See* Doc. 25-A at 01:16–23.) A refrigerator stood against the wall to the left of the front door. (*See id.* at 01:16–19; Doc. 25-C-5.) A collection of cleaning supplies and wooden

---

[7] The timestamps for each of the commands are as follows: "Set it down" (Doc. 25-A at 01:26–27); "Set it down, now" (*id.* at 01:28); "Drop the knife" (*id.* at 01:33–34); "Drop the knife" (*id.* at 01:35); "Drop the knife" (*id.* at 01:40); "Drop the fucking knife" (*id.* at 01:42–43); "Drop the knife, do it now" (*id.* at 01:44–46); "Drop the fucking knife" (*id.* at 01:47–48); "Drop the fucking knife, do it now" (*id.* at 01:50–51); "Drop the fucking knife" (*id.* at 01:53–54); "Drop the knife, do it now" (*id.* at 01:55–57); "Put'em on the ground" (*id.* at 01:58); "Put'em on the ground" (*id.* at 01:59–02:00); "Put it down now" (*id.* at 02:01–02); "Put it down" (*id.* at 02:03); "Put the fucking knife down" (*id.* at 02:04–05).

[8] The bystanders' comments are more understandable in Fierro's BWC video. (*See* Doc. 25-D.)

boards were stacked in front of and/or against the closed door and the wall opposite the front door to the home.[9] (Docs. 25-A at 01:16–18; 25-C ¶ 30; 25-C-5.)

When the two women exited the front door, Cosper moved into the entryway immediately opposite the front door that led into the house. (*See* Doc. 25-A at 01:21–26.) The women moved to his right and essentially blocked the only clear exit—the doorway from the entry porch area that led into the front patio. (*See id.* at 01:27–32.) Cosper stood frozen "with one foot braced against the back wall of the cased in entry corridor" for the entire interaction. (Doc. 25-C ¶ 77; Doc. 25-A at 1:21–54.) Until the final 14 seconds of the brief interaction, at which point Fierro forcibly moved the women away from Cosper's side, Cosper was essentially penned into the entryway of 825 Fir.

Cosper testified that because of the layout of the entryway, he could not step back to create more distance between himself and Baca without losing sight of her. (Doc. 25-C ¶ 79.) Cosper believed it was important to keep Baca in sight, as he "had not been able to confirm whether the [911] caller and the other occupants were safe . . . ." (*Id.* ¶ 80.)

### C.     Plaintiff's Lawsuit

Plaintiff filed a Complaint for Civil Rights Violations and the Wrongful Death of Amelia Baca on July 25, 2022. (Doc. 1.) Plaintiff brings four claims: <u>Count I</u>: Excessive Use of Force in Violation of Baca's Fourth Amendment Rights and 42 U.S.C. § 1983 against Cosper; <u>Count II</u>: Deprivation of Life Without Due Process in Violation of Baca's Fourteenth Amendment Rights and § 1983 against Cosper; <u>Count III</u>: Municipal Liability under the Fourth Amendment and § 1983 against the City of Las Cruces; and <u>Count IV</u>: Supervisory Liability under the Fourth Amendment and § 1983 against Dominguez. (*See id.* §§ 28–65.)

---

[9] Cosper did not believe that the closed door was in use due to the mops sitting against it. (Doc. 25-C ¶ 18.)

Cosper seeks summary judgment on Counts I and II on the basis of qualified immunity. (Doc. 25.) Plaintiff concedes, in her response brief, that Count II should be dismissed. (Doc. 32 at 1 n.1.) The Court will thus grant the motion as unopposed with respect to Count II and take up Count I in this Opinion.

## II.    Legal Standards for Motions for Summary Judgment on the Basis of Qualified Immunity

"Summary judgment is proper if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Halley v. Huckaby*, 902 F.3d 2236, 1143 (10th Cir. 2018) (citing *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018)). "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Emmett v. Armstrong*, 973 F.3d 1127, 1130 (10th Cir. 2020) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)). If there is video evidence that "blatantly contradicts the plaintiff's version of events[,]" however, the Court "will accept the version of the facts portrayed in the video . . . . *Id.* (quoting *Scott*, 550 U.S. at 378) (quotation marks, brackets, and subsequent citation omitted).

The Court reviews summary judgment motions based on a qualified immunity defense somewhat differently. *See id.* at 1132. "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *See Halley*, 902 F.3d at 1144 (quoting *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011)). "A constitutional right is clearly established if it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Id.* (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). "A Supreme Court or Tenth Circuit decision on point or the weight of authority from other courts can

clearly establish a right." *Id.* (citation omitted). "Generally, 'existing precedent must have placed the statutory or constitutional question beyond debate' to clearly establish a right." *Id.* (quoting *Redmond v. Crowther*, 882 F.3d 927, 935 (10th Cir. 2018)). "The question is not whether a 'broad general proposition' was clearly established, but 'whether the violative nature of particular conduct [was] clearly established.'" *Id.* (quoting *Redmond*, 882 F.3d at 935) (internal quotation marks omitted).

The Court may address the qualified immunity analysis in any order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). In fact, where a court is "firmly convinced the law is not clearly established" and the "constitutional violation question is so factbound that the decision provides little guidance for future cases[,]" it is prudent to proceed directly to the clearly established prong of the analysis. *See Tanner*, 864 F. Supp. 2d at 1108 (quoting *Kerns v. Bader*, 663 F.3d 1173, 1180–81 (10th Cir. 2011) (quotation marks omitted)).

"If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment . . . ." *Id.* (quoting *Koch*, 660 F.3d at 1238). And while the "Court must construe the facts in the light most favorable to the plaintiff as the nonmoving party, 'a plaintiff's version of the facts must find support in the record.'" *Koch*, 660 F.3d at 1238 (quoting *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 (10th Cir. 2009)). If the plaintiff's "version of the facts is 'blatantly contradicted by the record, so that no reasonable jury could believe it,' then [the Court] 'should not adopt that version of the facts.'" *Halley*, 902 F.3d at 1144 (quoting *Thomson*, 584 F.3d at 1312).

## III.    Cosper is entitled to qualified immunity on the excessive force claim.

### A.    Legal Framework for Excessive Force Claims

Courts "treat excessive force claims as seizures subject to the reasonableness requirement

of the Fourth Amendment." *Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1259–60 (10th Cir. 2008) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). "To establish a constitutional violation, the plaintiff must demonstrate the force used was objectively unreasonable." *Id.* "Thus the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (quoting *Graham*, 490 U.S. at 396) (quotation marks omitted). "Moreover, because police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation, the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective." *Id.* at 1259–60 (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)) (quotation marks omitted).

Courts "assess objective reasonableness based on whether the totality of the circumstances justified the use of force, and pay careful attention to the facts and circumstances of the particular case." *Id.* at 1260 (quoting *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995)) (quotation marks omitted). When analyzing reasonableness, courts consider three factors the Supreme Court outlined in *Graham*: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Estate of Ceballos v. Husk*, 919 F.3d 1204, 1213 (10th Cir. 2019) (quoting *Graham*, 490 U.S. at 396).

The Tenth Circuit has further held that "officers are not justified in using deadly force unless objectively reasonable officers in the same position 'would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others.'" *Id.* at 1213–14 (quoting *Thomson*, 584 F.3d at 1313) (subsequent citations omitted). "In assessing the threat"

that a suspect posed to an officer, the Tenth Circuit directs courts to consider: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Larsen*, 511 F.3d at 1260 (citing *Walker v. City of Orem*, 451 F.3d 1139, 1159 (10th Cir. 2006); *Jiron v. City of Lakewood*, 392 F.3d 410, 414–15 (10th Cir. 2004); *Zuchel v. Spinharney*, 890 F.2d 273, 274 (10th Cir. 1989)).

"Deadly force is justified under the Fourth Amendment if a reasonable officer in [the officer's] position would have had probable cause to believe that there was a threat of serious physical harm to [himself] or to others." *Id.* (quoting *Jiron*, 392 F.3d at 415) (emphasis omitted). Indeed, even "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back . . . the officer would be justified in using more force than in fact was needed." *Id.* (quoting *Jiron*, 392 F.3d at 415). "A reasonable officer need not await the glint of steel before taking self-protective action; by then, it is often too late to take safety precautions." *Id.* (quotation marks, ellipses, and citation omitted).

**B.     Cosper did not use excessive force under the circumstances.**

Plaintiff's excessive force claim is grounded in her assertion that Cosper unreasonably escalated the situation by immediately drawing his firearm on and yelling commands at Baca when he had information that she was mentally ill and could see that she was elderly. (*See* Doc. 32 at 7.) Although the determination of whether Cosper used excessive force is a close one, the Court finds that Cosper did not use excessive force when he shot Baca. The Court further finds that Cosper did not unreasonably escalate the situation.

### 1.     Severity of Crime

Cosper had information from Dispatch that a female subject was armed with a knife and was threatening the reporting party's life. Cosper also knew that the subject was striking the knife against the floor of the house, and he heard sounds of the same as he approached the entryway. Finally, Cosper knew that the reporting party had barricaded herself into a room of the house and that there was a child hiding in another room. Cosper asserts that this information "would support a charge of aggravated assault, and the use of something beyond minimal force to detain someone suspected of committing such an offense . . . ." (Doc. 25 at 18 (discussing N.M. Stat. Ann. §§ 30-3-1–2, 30-1-12).) Plaintiff does not disagree. (*See* Doc. 32.)

### 2.     Active Resistance or Attempts to Flee

Cosper acknowledges that the third *Graham* factor favors Plaintiff, as "Baca was standing inside her own home at the time of the shooting and was [neither] attempting to flee" nor "physically resisting apprehension." (Doc. 25 at 18.)

### 3.     Degree of Threat

The second *Graham* factor examines "whether the suspect pose[d] an immediate threat to the safety of the officers or others," *Pauly v. White*, 874 F.3d 1197, 1215 (10th Cir. 2017) (quotation and emphasis omitted), and "is undoubtedly the most important and fact intensive factor in determining the objective reasonableness of an officer's use of force," *id.* at 1216 (quotation marks and citation omitted). "[D]eadly force is only justified if the officer had probable cause to believe that there was a threat of serious physical harm to [himself] or others . . . ." *Id.* (quoting *Larasen*, 511 F.3d at 1260) (emphasis omitted). The Court turns now to the *Estate of Larsen* factors. Plaintiff failed to explicitly address these factors.

**Baca did not comply with Cosper's orders to drop the knives**: Cosper yelled at Baca 16 times to drop or put down the knives, and Baca never complied. Plaintiff asserts that "Cosper made no effort whatsoever . . . to understand why Ms. Baca might not have immediately complied." (Doc. 32 at 8–9.) Cosper attested, however, that he believed Baca *was* responding to his commands. (*See, e.g.*, Doc. 25-C ¶¶ 64, 71.) His impression was that when he ordered her to drop the knives, she said "no" and shook her head several times. (*Id.* ¶ 71.) The video evidence supports Cosper's impression that Baca was responding to him in the negative. (*See* Doc. 25-A at 01:28– 30, 01:33–35, 01:37–38, 01:43–44.) He also believed that Baca looked behind her and then took a step back when he commanded the bystanders to "back up, back up." (Doc. 25-C ¶ 64.) Although it appears that Baca started to look behind her at the same time Cosper gave the command to back up, the video evidence could be construed to support his impression.[10] (*See* Doc. 25-A at 01:31– 33.) Thus, a reasonable officer could have believed that Baca understood his commands and refused to comply with his 16 separate orders to drop the knives.

**Baca did not make any hostile motions with the knives toward Cosper**: Cosper admits that Baca did not raise the knives toward him in any kind of "slicing, stabbing, or thrusting motion . . . ." (Doc. 25 at 21.) Thus, this factor weighs against the use of deadly force.

**The distance between Baca and Cosper**: Plaintiff does not disagree that Cosper stood stationary with one foot braced against the back wall of the entryway for the entire encounter. Nor does Plaintiff disagree with Cosper's estimate of the distances between himself and Baca throughout: when Baca first appeared in the front room, she was approximately ten feet away from Cosper. (*See* Doc. 25-C ¶ 62.) After Baca took steps toward Cosper in the final seconds, she was

---

[10] Regardless, Plaintiff does not dispute Cosper's impression on this point. (*See* Doc. 32 at 2–3 (disputing UMF Nos. 37–42 only to the extent that they suggest Cosper was being harassed by the bystanders).)

within six to seven feet of him. (*Id.* ¶ 102.) Given the layout of the entryway and the bystanders pressed against his right side, Cosper was essentially hemmed in without a clear exit until Fierro pushed the bystanders back prior to the last 14 seconds of the incident. (*See* Doc. 25-D at 00:57–01:12.)

Plaintiff argues, however, that Cosper's conduct in immediately confronting and drawing his weapon on Baca was unreasonable, as he made no attempt to deescalate the situation. (Doc. 32 at 8–9.) Plaintiff cites LCPD General Order 245.04 in her recitation of the facts. (*Id.*at 5.) Plaintiff fails to flesh out any argument regarding LCPD policy (*see id.* at 7–10), but presumably believes that Cosper's conduct (*e.g.*, his failure to obtain additional information about Baca from the bystanders and his conduct in yelling orders to drop the knives) violated the policy and establishes that he violated Baca's constitutional rights.

It is unclear when Cosper would have stopped to gather such information, as he was immediately confronted with Baca standing in the doorway and holding two knives. Even so, Cosper argues that "the policy at issue is framed in discretionary terms and provides officers with a range of responses for dealing with a mentally ill person who many [sic] pose a threat to the officer or others." (Doc. 44 at 15 (citing Doc. 32-2-A at 8 ("the following responses may be taken")).) The Court agrees. Regardless, even if Cosper's conduct had violated the policy, it would not automatically result in the violation of a constitutional right. *See Tanberg v. Sholtis*, 401 F.3d 1151, 1160 (10th Cir. 2005); *Davis v. Scherer*, 468 U.S. 183, 194 (1984). Plaintiff offers no authority to the contrary.

Moreover, Cosper's undisputed testimony establishes that he could not have backed away in an effort to deescalate because if he left the entryway, he would no longer have had Baca in sight. (*See* Doc. 25-C ¶ 79.) As Cosper "had not been able to confirm whether the caller and other

15

occupants were safe, it was important to keep Ms. Baca in sight." (*Id.* ¶ 80.) Cosper also would have risked the safety of the two bystanders and Fierro if he had allowed Baca to continue moving outside.

Considering the circumstances, the close distance between Baca and Cosper does not support a finding that Cosper's conduct violated Baca's constitutional rights.

**<u>Baca's manifest intentions</u>**: Cosper argues that although Baca never made a hostile motion with her weapon, he understood the change in her demeanor, body language, and position in the last several seconds of the encounter "to be a hostile motion." (Doc. 25 at 21.) Two seconds before Cosper shot Baca, the video shows that Baca's expression changed, she straightened her stance, and she took two slow steps toward Cosper, closing the distance between them by several feet. (Doc. 25-A at 02:04–05.)

Plaintiff construes Baca's actions differently, noting that Baca moved toward Cosper shortly after Cosper pointed to the ground; thus, Baca could have understood that he had ordered her to move to that area. (Doc. 32 at 3, 9.) Plaintiff also characterizes Baca's steps as small and shuffling. (*Id.* at 3.) While a jury could agree with Plaintiff's characterization of Baca's movements and intent (*i.e.*, that Baca took small, shuffling steps toward Cosper to comply with his orders), Plaintiff fails to demonstrate a factual dispute regarding Cosper's *impression* of Baca's conduct. Consequently, it is clear to the Court that Cosper understood Baca posed an immediate serious threat to his and/or the bystanders' safety. As the Tenth Circuit has found, even "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back . . . the officer would be justified in using more force than in fact was needed." *Larsen*, 511 F.3d at 1260 (quotation omitted).

In rendering its decision, the Court finds helpful guidance in *Estate of Larsen*.[11] In *Larsen*, the decedent (Larsen) "called 911 threatening to 'kill someone or himself.'" *Id.* at 1258 (citation omitted). Officers approached Larsen's house and found him on the porch with a large knife in his hands. *Id.* The officers drew their firearms and ordered Larsen to put the knife down. *Id.* Larsen raised the knife with the blade pointed toward one of the officers; the officer told him several times to drop the knife. *Id.* Larsen took a step from the porch toward the officer standing below him on the sidewalk, and the officer shot and killed Larsen. *Id.* at 1258–59. The district court found that the officer's use of force was not unreasonable given the circumstances., and the Tenth Circuit affirmed *Id.* at 1259, 1264. The Tenth Circuit noted that the use of deadly force was made reasonable by "the heightened immediacy of the threat[,]" made clear by the following facts:

> (1) Larsen had already threatened violence against himself and others; (2) the officers responded to an emergency call late at night; (3) when the officers arrived, they encountered a man armed with a knife; (4) both officers repeatedly told Larsen to put down the knife; (5) the knife was a large weapon with a blade over a foot in length rather than a mere pocket knife or razor blade; (6) Larsen refused to cooperate with the officers' repeated orders to drop his weapon; (7) Larsen held the high ground vis-a-vis the officers; (8) Larsen raised the knife blade above his shoulder and pointed the tip towards the officers; (9) [a second officer] was also prepared to use force and was moving into position to be able to do so; (10) Larsen turned and took a step toward [the shooting officer]; (11) the distance between [the shooting officer] and Larsen at the time of the shooting, though disputed, was somewhere between 7 and 20 feet.

*Id.* at 1260–61.

Similarly, here, Baca threatened violence to occupants of the home; Cosper responded to the call in the evening and encountered Baca armed with two kitchen knives; Cosper repeatedly ordered Baca to put down the knives, at least one of which Cosper described as "long-bladed";

---

[11] In arguing that he is entitled to qualified immunity on Count I, Cosper discusses *Larsen* and several other cases in his opening brief. (*See* Doc. 25 at 20–29 (discussing, *e.g.*, *Larsen*, 511 F.3d at 1262; *Tenorio v. Pitzer*, 802 F.3d 1160 (10th Cir. 2015); *Zuchel*, 997 F.2d 730; *Walker*, 451 F.3d 1139).) Plaintiff does not respond to Cosper's arguments on these cases. (*See* Doc. 32.)

Baca seemingly refused to comply with Cosper's orders then took two steps toward him, closing the distance from approximately ten feet to approximately six feet. Finally, Cosper understood that Baca's intent in moving toward him was hostile. As in *Larsen*, the circumstances here were "tense, uncertain, and rapidly evolving[,]" *see id.* at 1259 (quotation omitted), and Cosper was "forced to make split-second judgments . . . ." *Id.* at 1261. The Court finds that "even if [Cosper's] assessment of the threat was mistaken, it was not objectively unreasonable." *See id.* The Court concludes that, viewing the undisputed facts in a light most favorable to Plaintiff, a reasonable officer could have understood that Baca posed a serious and immediate threat, justifying the use of deadly force. Cosper is entitled to qualified immunity.

### C.    Cosper did not violate clearly established law.

Even if the Court found that Cosper used excessive force, Plaintiff fails to offer authority that would put Cosper on notice that his conduct was unconstitutional. Again, Plaintiff focuses on whether Cosper's conduct escalated the situation, thereby causing the need for deadly force. (*See, e.g.*, Doc. 32 at 7 (emphasizing the importance of "focus[ing] not on the shooting itself, but rather on the officers' actions preceding the shooting" where "the officers' actions unreasonably escalated the situation to the point deadly force was required") (citation omitted).) Plaintiff relies on five cases: *Stewart v. City of Prairie Village, Kansas*, 904 F. Supp. 2d 1143 (D. Kan. 2012); *Hastings v. Barnes*, 252 F. App'x 197 (10th Cir. 2007); *Estate of Ceballos v. Husk*, 919 F.3d 1204 (10th Cir. 2019); *Allen v. Muskogee, Okla.*, 119 F.3d 837 (10th Cir. 1997); and *Teel v. Lozada*, 826 F. App'x 880 (11th Cir. 2020). The Court begins with *Teel* and *Stewart*, the cases Plaintiff discusses in the most depth. (*See* Doc. 32 at 7–10.)

In *Teel*, an officer (Lozada) "responded to a mental health crisis call at" a residence. 826 F. App'x at 881. Lozada was first on the scene and did not wait for backup to arrive. *See id.* at 882.

Teel's husband told Lozada that Teel "was upstairs, was trying to kill herself, was under the influence of narcotics and/or alcohol, and was armed with a knife . . . ." *Id.* Lozada understood, though, that "Teel had not tried to harm" her husband and there was no indication "that she was a danger to anyone other than herself." *Id.* Lozada drew his gun as he headed upstairs. *Id.* He saw Teel, 60 years old, 5'2" tall, and 120 pounds, lying quietly on her bed. *Id.* at 882–83. Lozada announced his presence and ordered Teel to show him her hands. *Id.* at 883. Teel stood up, the bed between the two, and brought both hands from behind her back to reveal a kitchen knife. *Id.* "Lozada took 'two or three' steps inside the bedroom" but gave Teel no other instruction or warning. *Id.* After about ten seconds, Teel began to walk gradually in Lozada's direction and said in relevant part, "Kill me." *Id.* Lozada pointed his firearm at Teel, took a step back, and radioed to dispatch that Teel had a knife. *Id.* Teel said "Come on, just do it[,]" and Lozada responded, "don't come." *Id.* "Teel never made a sudden movement or ran or lunged" toward Lozada, "[n]or did she point the knife in his direction." *Id.* "Lozada never instructed [her] to drop the knife, never clearly instructed her to stop moving, and never warned that he would shoot her if she failed to comply." *Id.* At the time Lozada shot Teel, she was approximately ten feet from him. *See id.* (noting that the record showed Teel was six to ten feet from Lozada, but "accept[ing] the longer of these distances" for purposes of summary judgment). The evidence showed that "Lozada was armed with pepper spray and a taser, yet he used neither." *Id.*

Plaintiff notes that the *Teel* court remarked on "the decedent's 'diminutive' size, that she never made any sudden movements, and that the officer could have backed up and coordinated with" other officers "or used a non-lethal method to subdue" Teel. (Doc. 32 at 9 (citing *Teel*, 826 F. App'x at 826).) *Teel* is distinguishable for several reasons. The Eleventh Circuit "conclude[d] that there [was] a genuine dispute as to whether Mrs. Teel posed a significant, immediate threat to

Officer Lozada's safety" because, in relevant part, she had not threatened her husband or the officer and was ten feet away. *Teel*, 26 F. App'x at 886. In contrast, Cosper had information that Baca had both threatened to kill the 911 caller and was stabbing at the floor with her knife during the call and when he arrived, and Baca was six to seven feet away when Cosper shot her.

The Eleventh Circuit also stated that "[p]erhaps most tellingly, Officer Lozada was aware and conceded that alternative actions—retreating . . . or using a non-lethal method to subdue Mrs. Teel—were available means of resolving the situation." *Id.* (quotation marks, brackets, and citation omitted). Cosper attested to the opposite: he did not feel that it was safe to lose sight of Baca due to his concern for the other occupants of the house. Plaintiff fails to dispute Cosper's testimony on this point. And although Plaintiff points out that Fierro had a taser and could have used non-lethal means to subdue Baca, Plaintiff has not shown that Cosper was aware of this fact or had non-lethal means of his own.

In *Stewart*, the police department was familiar with the decedent (Stuckey), an individual with mental health problems. 904 F. Supp. 2d at 1150. On the day of her death, "Stuckey made several 911 calls . . . , demanding that the police" come to her residence and stating that "she was going to commit 'suicide by cop.'" *Id.* at 1150–51. At least 15 officers responded. *Id.* at 1151. Stuckey, who was barricaded in her home and was armed with a baseball bat, repeatedly yelled through the front door that she would kill herself. *Id.* at 1151–52. The following resources were available either on scene or with a phone call, and police declined to utilize them: mental health center staff; Critical Incident Response Team (CIRT) officers; an officer trained in hostage negotiation; and Stuckey's mother. *See id.* at 1151. Police planned to enter the residence and forcibly remove Stuckey without considering any other methods, including chemical munitions or non-lethal weapons. *Id.* at 1151–52. The plan violated department policy, which stated "that

negotiations should be the primary tactic in [a] barricade situation." *Id.* A group of officers went into the residence with a battering ram. *Id.* Stuckey swung the bat, but they disarmed her. *Id.* An officer ordered Stuckey, "don't pick up that knife[,]" and shots were fired two seconds later, killing Stuckey. *Id.*

The court found that the factual allegations were sufficient to make out a claim for excessive force. *Id.* at 1154. In particular, the court noted that because one of the bullets entered Stuckey's back and the gun was fired from a distance, a reasonable officer would not have probable cause to believe Stuckey posed a serious threat of harm. *See id.* Even if the officers reasonably believed there was such a threat, the court noted that it "would still have to determine whether [the officer] recklessly or deliberately brought about the need to use such force." *Id.* (quoting *Allen*, 119 F.3d at 840). The court held that the allegations concerning the repeated failures to comply with crisis intervention standards showed the officers "recklessly or deliberately brought about the need to use deadly force." *Id.*

The *Stewart* court noted that it was "clearly established that an officer acts unreasonably when he aggressively confronts an armed and suicidal/emotionally disturbed individual without gaining additional information or by approaching him in a threatening manner." *Id.* at 1156 (citing *Hastings*, 252 F. at 203). *Stewart* is inapposite because the circumstances there were vastly different from those confronting Cosper. There are no facts to show that officers were concerned about other occupants in Stuckey's residence or that she had threatened anyone prior to police arriving. And critically, the officers in *Stewart* had time and space to make decisions about how to approach Stuckey. Cosper, on the other hand, immediately encountered Baca in the doorway holding knives. He had neither the luxury of time nor the multiple resources offered to and rejected

by the officers in *Stewart*. Consequently, *Stewart* cannot serve as clearly established law in this case.

In *Hastings*, the Tenth Circuit found that four officers acted in a reckless and deliberate manner, which "unreasonably escalated" an encounter with a suicidal individual (Hastings) "to the point deadly force was required." 252 F. App'x at 203. There, the officers followed Hastings into his home and crowded into his bedroom "doorway (leaving no room for retreat), issued loud and forceful commands at him and pepper-sprayed him, causing him to become even more distressed." *Id.* Although Hastings picked up a Samurai sword in his bedroom, "a[t] the time they pepper-sprayed him, [Hastings] was not verbally or physically threatening [the officers]." *See id.* at 199–200, 203. The Court agrees that Cosper issued loud and forceful commands to Baca, which likely escalated the situation. The Court does not find, however, that Cosper was reckless when he approached the front entryway of the home. And again, Cosper encountered an individual who had threatened to kill other occupants in the home whose safety was still at issue, unlike Hastings, who was suicidal and had not threatened anyone else. In short, *Hastings* does not direct a finding that Cosper deliberately and recklessly escalated the incident here.

In *Allen*, police officers shot and killed a man (Allen) who was sitting in his vehicle holding a firearm. 119 F.3d at 839. Officers had information that Allen had threatened family members, was armed, and was threatening suicide. *Id.* The Tenth Circuit found that the officers may have escalated the situation, as a bystander reported that one officer "ran 'screaming' up to Mr. Allen's car and immediately began shouting at [him] to get out of his car . . . ." *Id.* at 841. The officer then "reached into the vehicle and attempted to seize [the] gun, while [a second officer] held Mr. Allen's left arm." *Id.* at 839. The Tenth Circuit found that "a reasonable jury could conclude . . . that the

officers' actions were reckless and precipitated the need to use deadly force." *Id.* at 841 (citation omitted).

The circumstances were similar in *Ceballos*, where officers quickly approached a subject (Ceballos) "screaming at [him] to drop [a baseball] bat and refusing to give ground as Ceballos approached the officers." 919 F.3d at 1216. In that case, a woman called 911 to report that Ceballos was outside of their home with baseball bats, that he was drunk and probably on drugs, and that she was afraid and had an infant daughter. *Id.* at 1209. The responding officers also knew that Ceballos had walked away from a medical facility the previous night. *Id.* Officers spoke with the wife, who was parked in a car down the street, before approaching Ceballos. *Id.* at 1210. Although Ceballos had two friends with him who attempted to give officers information, the officers declined to speak with them and told them to back away. *See id.* When officers confronted Ceballos, there were no bystanders in the immediate vicinity. *See id.* Ceballos walked toward the officers, who ordered him to stop. *Id.* The officers shot Ceballos when he was between 12 and 20 feet away. *See id.* at 1227 (Bacharach, J., concurring in part and dissenting in part). The Tenth Circuit held that in light of the decisions in *Hastings* and *Allen*, Ceballos's "conduct in his own driveway, which posed harm to no one" and did not "become aggressive <u>toward the officers</u> until [they] approached him directly, . . . could not lead reasonable officers to believe they were justified in fatally shooting [him] within one minute of the initial encounter." *Id.* at 1217–18.

Cosper addresses *Allen* and *Ceballos* in his motion. (*See* Doc. 25 at 27.) He acknowledges that at "first glance it could appear [the] cases are similar[,]" because they involve armed subjects who were emotionally distraught or impaired and had threatened family members. (*See* Doc. 25 at 27.) Cosper argues that the circumstances here are distinguishable because "in contrast to the suspects in *Allen* and *Ceballos*, [Baca] had threatened to *kill another occupant* of her home[] and

*was simulating her threat* by stabbing at the floor of her home with a knife." (*Id.* at 28.) Moreover, unlike the officers in *Allen* and *Ceballos* who advanced on the subjects, Cosper did not continue to approach Baca once he saw her in the entryway; rather, he remained frozen outside the house. (*See id.*) Moreover, Cosper did not have a realistic option to retreat, as he knew that both the occupants' and bystanders' safety was at risk and thus he could not allow Baca to leave his sight. (*See id.*) The Court agrees with these distinctions and finds that neither *Allen* nor *Ceballos* gave notice to Cosper that his conduct would violate Baca's constitutional rights.

In considering whether the law was clearly established, the Court finds the decision in *Jackson v. City of Wichita, Kansas* instructive. No. CV 13-1376-KHV, 2017 WL 106838 (D. Kan. Jan. 11, 2017). There, officers responded to a call from a man who said that his wife (Jackson), who had obtained a protection from abuse order against him, was at his house and would not leave. *Id.* at *4. When officers arrived, the husband was waiting and verified that Jackson "had some mental issues and had trouble comprehending things . . . ." *Id.* Officers did not ask if Jackson was alone or inquire about her state of mind, whether she was intoxicated, had a weapon, or had been violent. *Id.* Although there was no emergency, the officers "left immediately to go to the house to talk with [her] and have her leave." *Id.* Jackson stepped onto the front porch as the officers crossed the driveway. *Id.* at *7. Seeing that Jackson held a knife with a ten-inch long blade, one officer pointed his firearm at "Jackson and yelled repeated commands for her to drop the knife." *Id.* Jackson screamed at the officers, who were 30 to 35 feet away, to shoot her. *Id.* The officers saw Jackson stab herself with the knife. *See id.* at *8. Jackson then "stepped down to the driveway and walked toward the officers" with "the knife . . . at stomach level with the blade pointing out." *Id.* She got within 15 feet from the officers and although the knife was pointed up, Jackson "did not

swing it at the officers or threaten to hurt them." *Id.* at *9. The officers both fired at Jackson, killing her. *Id.*

   "Although no emergency existed, the officers did not attempt to learn information about [her] condition" and instead approached her without a plan. *See id.* at *12. "When they first saw . . . Jackson, she posed no threat to herself, to them or to any third parties . . . ." *Id.* Rather than "attempt to talk with and/or help [her] from a distance, [the officers] drew their guns, shined flashlights in her eyes and repeatedly yelled at her to drop the knife . . . ." *Id.* The officers "did not attempt to de-escalate the situation or form a plan to avoid the use of deadly force." *Id.* The court found that given the factual allegations, "a jury could reasonably find that [the officers] recklessly escalated the situation to a point which arguably required deadly force." *Id.* (citing *Hastings*, 252 F. App'x at 203; *Allen*, 119 F.3d at 840–41; *Sevier*, 60 F.3d at 701; *Tenorio*, 2014 WL 11429062, at *4). Thus, the Court denied the officers "qualified immunity on the ground that no constitutional violation occurred." *Id.*

   The Court granted qualified immunity, however, on the basis that the facts of prior cases were "not sufficiently analogous to put [the officers] on fair notice that it was objectively unreasonable to use lethal force" given the undisputed facts. *Id.* at *13. The court held that, in light of the similarity to the facts in *Larsen*, the "plaintiffs cannot show that the asserted right was clearly established under Tenth Circuit law."[12] *Id.* at *15. The same is true here.

   Although this case presents a close call, the Court sides with Cosper. Unlike the officers in the cases Plaintiff relies on, Cosper did not recklessly escalate the situation by needlessly getting closer to Baca. *See Allen*, 119 F.3d at 841 (noting that the officer "ran 'screaming' up to [the] car"

---

[12] The *Jackson* court also examined *Zuchel* and *Walker*, two cases Cosper addressed in detail, but Plaintiff did not mention in her response brief. *See* 2017 WL 106838, at *13–14. (*See also infra* n.11.)

and then reached in to try to seize the gun); *Ceballos*, 919 F.3d at 1217 (noting that the officers approached and yelled at Ceballos, who was not in danger of harming anyone, without stopping to get information from bystanders); *cf. City of Tahlequah, Okla. v. Bond*, 142 S. Ct. 9, 12 (2021) (finding that officers' conduct in "engag[ing] in a conversation with [a subject], follow[ing] him into a garage at a distance of 6 to 10 feet, and" yelling only after the subject picked up a hammer was "dramatically different" from the officers in *Allen* who "sprint[ed] toward a parked car, scream[ed] at the suspect, and attempt[ed] to physically wrest a gun from his hands") (discussing *Allen*, 119 F.3d at 841). Rather, Cosper approached the house and engaged Baca only because she appeared in the doorway with knives after the bystanders exited. True, Cosper's tone and volume were loud and harsh. However, it does not appear from the video evidence that Cosper had time or space to talk to the bystanders (as the officers did in *Ceballos*) or could otherwise safely retreat to leave Baca alone without concern for the other occupants of the house. Cosper is entitled to qualified immunity because his conduct did not violate clearly established rights of which a reasonable officer would have known. *See White v. Pauly*, 580, U.S. 73, 78–79 (2017).

## IV.    Conclusion

Plaintiff fails to demonstrate that Cosper's conduct violated a constitutional right, and Cosper is therefore entitled to qualified immunity on that basis. Alternatively, even if Cosper did violate Baca's right to be free from excessive force, Plaintiff fails to show that the right was clearly established. Cosper is entitled to qualified immunity on the claim for excessive force and Count I is dismissed.

Plaintiff concedes that the due process claim may not proceed and Count II is dismissed.

**THEREFORE,**

**IT IS ORDERED** that Cosper's Motion for Partial Summary Judgment on the Basis of Qualified Immunity as to Counts I and II (Doc. 25) is **GRANTED** and Counts I and II are **DISMISSED**.

**IT IS FURTHER ORDERED** that the parties are directed to file a Joint Status Report within **10 days** of the entry of this Opinion, detailing whether the remaining motions (Docs. 48–50) are still at issue given the Court's decision on qualified immunity.

_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE