**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

PERLA ENRIQUEZ BACA, as
the personal representative of
AMELIA BACA, deceased,

Plaintiff,

vs. Case No. 2:22-cv-00552 KWR/JHR

JARED COSPER, in his individual capacity
THE CITY OF LAS CRUCES, and
LAS CRUCES POLICE CHIEF MIGUEL DOMINGUEZ,

Defendants.

**MEMORANDUM OPINION AND ORDER GRANTING CITY DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

THIS MATTER comes before the Court upon City Defendants' Motion for Partial Summary Judgment No. II **(Doc. 48)**. Having reviewed the parties' briefs and applicable law, the Court finds that City Defendants' Motion for Partial Summary Judgment No. II is well taken and, therefore, is **GRANTED**. The disposition of this Motion renders City Defendants' Motion for Separate Trials **(Doc. 50) MOOT**.

This case arises from the fatal shooting of Amelia Baca, a 75-year-old woman suffering from dementia, in Las Cruces, New Mexico. Her sister and Personal Representative (the "Estate") filed a complaint alleging that Defendant Jared Cosper, the police officer who fatally shot her, used excessive force in violation of the Fourth Amendment.[1] On appeal from the district court's decision granting summary judgment based on qualified immunity, the Tenth Circuit held that a

[1] The Estate also alleged that the officer deprived Decedent's life without due process in violation of the Fourteenth Amendment. **Compl. at ¶¶ 38–45, Doc. 1**. But it abandoned that claim at summary judgment. *See Baca v. Cosper*, 128 F.4th 1319, 1324 n.2 (10th Cir. 2025).

reasonable jury could find a Fourth Amendment excessive-force violation by Defendant Cosper, and that such a violation would have been clearly established on the date of the shooting. *Baca*, 128 F.4th at 1321 (10th Cir. 2025). As that issue marches towards trial, this Court considers two other allegations in the Estate's Complaint at the summary judgment stage: (1) that the City of Las Cruces' policies and customs, as well as its failures to properly train and supervise its officers, resulted in the alleged violation of Decedent's Fourth Amendment rights at the hands of Defendant Cosper, and (2) that, as Defendant Cosper's supervisor, Las Cruces Police Chief, Miguel Dominguez's deliberate indifference towards the proper enforcement of the Las Cruces Police Department's (LCPD) policies and proper training of LCPD officers caused Defendant Cosper to allegedly violate Decedent's Fourth Amendment rights. **Compl. at ¶¶ 46–65, Doc. 1**.

The Court finds that the Estate has failed to raise a genuine dispute that the City's policies, customs, or training resulted in Defendant Cosper's alleged use of excessive force. And the Court finds that that the Estate has failed to raise a genuine dispute that Defendant Dominguez caused the alleged constitutional violation by being deliberately indifferent to LCPD's policies and to his officers' training. Accordingly, the Court concludes that the City and Defendant Dominguez (referred to together as City Defendants) are respectively entitled to summary judgment on the issue of liability.

## BACKGROUND

On April 16, 2022, while employed as a LCPD police officer, Defendant Jared Cosper responded to a dispatch call reporting that a 75-year-old woman suffering from dementia (Decedent) was threatening her family members. **Compl. at ¶¶ 6–7**. Upon arriving at the front door of Decedent's home, Defendant Cosper asked two of her family members to exit the residence. ***Id.* at ¶ 9**. Soon thereafter, Decedent appeared in the doorway holding a knife in each hand. ***Id.* at ¶ 10**. For the next 38 seconds, Defendant Cosper shouted at Decedent to put the knives

down before shooting her twice in the chest. ***Id.* at ¶¶ 11–18**. He failed to provide or seek medical care for her, and she died as a result of the gunshots. ***Id.* at ¶¶ 18, 42**.

Plaintiff Perla Enriquez Baca, Decedent's sister and Personal Representative, filed a complaint on July 25, 2020, alleging that Decedent's Fourth and Fourteenth Amendment rights were violated by Defendant Cosper, the City, and Defendant Dominguez. ***Id.* at 1**. The Complaint makes four claims: two against Defendant Cosper, one against the City, and one against Defendant Dominguez. ***Id.* at ¶¶ 28–60**. The Estate eventually abandoned the Fourteenth Amendment claim against Defendant Cosper. *See Baca*, 128 F.4th at 1324 n.2. Then, the Tenth Circuit held that a reasonable jury could conclude that Defendant Cosper violated Decedent's Fourth Amendment right against the use of excessive force. *Baca*, 128 F.4th at 1321. That issue is set for a jury trial in 2027.

The remaining two claims are the subject of City Defendants' instant Motion for Partial Summary Judgment No. II. The district court originally denied this Motion as moot because it concluded that there was no underlying constitutional violation as a matter of law, a condition precedent of the third and fourth claims. ***See* Joint Status Rep. at 1–2, Doc. 63**. Following the Tenth Circuit's reversal and remand on the constitutional issue, *see Baca*, 128 F.4th at 1321, the parties now agree that this Motion is no longer moot and ask this Court to rule on it. ***See* Scheduling Conf. at 1, Doc. 90**. Accordingly, the Court considers Counts III and IV in turn.

In Count III, the Estate claims that the City is liable under § 1983 municipal liability for Defendant Cosper's alleged violation of Decedent's Fourth Amendment right against the excessive use of force. This includes both the theories that Defendants' policies or customs led to the

violation of Decedents' rights and that their failure to properly train officers caused the same.[2] In Count IV, the Estate claims that Defendant Dominguez is liable under § 1983 supervisory liability for Defendant Cosper's alleged violation of Decedent's Fourth Amendment right against the excessive use of force.

**LEGAL STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). As the Tenth Circuit has explained, "mere assertions and conjecture are not enough to survive summary judgment." *York v. AT&T*, 95 F.3d 948, 955 (10th Cir. 1996). To avoid summary judgment, a party "must produce specific facts showing that there remains a genuine issue for trial and evidence significantly probative as to any [material] fact claimed to be disputed." *Branson v. Price River Coal Co*., 853 F.2d 768, 771-72 (10th Cir. 1988) (internal citation omitted).

"A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1306 (10th Cir. 2017) (quotation marks and citation omitted).

[2] City Defendants' Motion also addresses a purported failure to hire theory, another way of exacting municipal liability under § 1983. However, the Estate's Complaint alleges no facts that might support such a theory, ***see generally*** **Compl.**, nor does the Estate raise it in its Response, ***see generally*** **Pl's. Response Mot. Partial Summ. J., Doc. 53**. Accordingly, City Defendants need not attempt to demonstrate that this theory fails as a matter of law, and the Court will not address arguments to that end.

Where the moving party does not have the ultimate burden of persuasion at trial, it still has the initial burden of production on a motion for summary judgment. Fed. R. Civ. P. 56(c); *see also Eaves v. Fireman's Fund Ins. Cos.*, 148 Fed.App'x 696, 700 (10th Cir. 2005) (internal citation omitted). The moving party may carry its initial burden of production "by showing that [the nonmoving] party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact." Fed. R. Civ. P. 56(c)(1)(B) (Comm. cmts. 2010). "Th[is] burden on the moving party may be discharged by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (quoting *Celotex*, 477 U.S. at 325). "If the movant carries this initial burden, the non-movant may not rest upon its pleadings, but must set forth specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (citing *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir. 1996)).

When determining whether the movant has carried its burden, the Court keeps two principles in mind. First, while the Court must draw all reasonable inferences in the light most favorable to the non-moving party, *id*. at 1306, that party's "version of the facts must find support in the record," *Thomson v. Salt Lake County*, 584 F.3d 1304, 1312 (10th Cir. 2009). Second, the Court's role is not to weigh the evidence or decide any issues of credibility, but to assess the threshold issue of whether a genuine issue exists as to material facts requiring a trial. *See Liberty Lobby*, 477 U.S. at 249, 255.

The Tenth Circuit treats a plaintiff's "inclusion of new allegations in a response to a motion for summary judgment[] as a potential request to amend the complaint" pursuant to Fed. R. Civ. P. 15. *Adams v. C3 Pipeline Constr. Inc.*, 30 F.4th 943, 971 (10th Cir. 2021) (quoting *Martinez v. Potter*, 347 F.3d 1208, 1211 (10th Cir. 2003)). "[W]hen a party raises a claim in materials filed in opposition to a motion for summary judgment, the district court should treat the filing as a request

to amend the pleadings and should consider whether the evidence presented creates a triable issue of material fact." *Viernow v. Euripides Dev. Corp.*, 157 F.3d 785, 790 n.9 (10th Cir. 1998) (internal citations omitted).

> As a general rule, a plaintiff should not be prevented from pursuing a valid claim just because she did not set forth in the complaint a theory on which she could recover, provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits.

*Evans v. McDonald's Corp.*, 936 F.2d 1087, 1090–91 (10th Cir. 1991) (quoting 5 C. Wright & A. Miller, *Fed. Prac. Proc.* § 1219, at 194 (1990)). District courts enjoy broad discretion in determining whether to grant this request. *Martinez*, 347 F.3d at 1212.

## STATEMENT OF FACTS[3]

City Defendants assert thirty-one relevant[4] "undisputed material facts." **Defs.' Mot. Partial Summ. J. at 2–15, Doc. 48**. Four are supported with citations to materials in the record.[5] ***Id.***; ***see also*** **Defs.' Reply Mot. Partial Summ. J. at 2, Doc. 56**. Four are supported by citations to New Mexico statutory law.[6] **Doc. 48 at 2–15**. Twenty are supported by pointing out that there is no contrary admissible evidence in the record.[7] ***Id***. The remaining three are affirmative statements that are not supported by the record.[8] ***Id***. In Response, the Estate argues that City Defendants' failure to cite to the record for these facts violates Rule 56. **Pl's. Response Mot. Partial Summ. J. at 2–3, Doc. 53**. The Estate claims that it "cannot reasonably respond to each assertion of fact in [Defendants'] Motion without them being tethered to the record," and asks the

[3] This section focuses on facts relevant to the City's and Defendant Dominguez's liability, omitting facts relevant only to Defendant Cosper's case.
[4] Facts 22-33 concern a failure to hire theory that has not been pleaded and, therefore, will not be addressed by the Court.
[5] UMFs 1, 4, 34, and 35.
[6] UMFs 7, 8, 9, and 11.
[7] UMFs 2, 3, 5, 6, 10, 12, 14, 17–21, 36–43.
[8] UMFs 13, 15, and 16.

Court to summarily deny City Defendants' Motion for failure to comply with Rule 56. ***Id.* at 3**. The Estate also offers twenty-seven of its own facts, ***id.* at 3–7**, almost all of which City Defendants admit in Reply, ***see* Doc. 56**.

The Estate bears the ultimate burden of persuasion at trial on the issues whether the City and Defendant Dominguez are liable under § 1983 municipal liability and supervisory liability, respectively. Therefore, City Defendants may carry their burden of production at summary judgment simply by showing that the Estate "cannot produce admissible evidence to carry its burden as to the fact[s]." Fed. R. Civ. P. 56(c)(1)(B) (Comm. cmts. 2010); *see also Schneider*, 717 F.3d at 767 (quoting *Celotex*, 477 U.S. at 325) (explaining that when the non-movant carries the burden at trial, the movant on summary judgment may discharges its burden by "pointing out to the district court[] that there is an absence of evidence to support the nonmoving party's case"). Because City Defendants have done so, and the Estate—by refusing to respond to their assertions—has failed to set forth specific contrary facts in response, the Court treats all of City Defendants' material facts as undisputed. *Barney*, 143 F.3d at 1307 (citing *Kaul*, 83 at 1212).

Accordingly, the following recitation of facts incorporates the facts in City Defendants' Motion that are either supported by the record, New Mexico statutory law, or pointing out that no contrary evidence exists in the record,[9] in addition to the facts in the Estate's Response that Defendants admitted or did not genuinely dispute.

## I. <u>City Defendants' policies and customs leading up to, and on the date of, the shooting</u>

Prior to, and at the time of, the April 16, 2022, fatal shooting of Decedent by Defendant Cosper, the following policy governed the use of force by LCPD officers:

[9] The affirmative facts which are not supported by the record (UMF 13, 15, and 16) are excluded. When reciting the facts, the Court will note which four of Defendants' facts are affirmatively supported by the record. The Court will also distinguish between the Defendants' facts (UMF) and Plaintiffs' facts (SAMF).

**255 USE OF FORCE**

**PURPOSE**

The purpose of this policy is to guide employees in the proper and reasonable application of force during the course of their duties.

**POLICY**

It is the policy of the Las Cruces Police Department that employees shall use force which is reasonable to protect the sanctity of human life, preserve and protect individual liberties, and to effect lawful objectives. The legal standards used to determine the lawfulness of the use of force is the Fourth Amendment to the United States Constitution.

The Las Cruces Police Department examines all use of force incidents from an objective standard rather than a subjective standard using all available and current Federal and State Case Law. The Las Cruces Police Department values the safety of all human life, the public, and the officer; above all this will be an overriding concern when the use of force is considered.

* * *

**255.01 USE OF FORCE** - Graham v. Connor, 490 U.S. 386 (1989)

A. The United States Supreme Court, in a case entitled Graham v. Connor, sets forth the analytical model by which all use of force cases are reviewed. As required by Graham, an officer's use of force is assessed by examining the facts and circumstances known to the officer including a review of the following:

   1. The severity of the suspect's crimes;

   2. The immediacy of the threat posed by the suspect to the safety of the officers or others; and

   3. Whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

B. As used in Graham, "objectively reasonable" is strongly related to the legal standards of reasonable suspicion and probable cause. Objective reasonableness requires that the officer's perspective be used to determine the level of threat that the suspect poses, supported by facts.

C. The officer must be able to identify specific and articulable facts. An officer must list the information that he or she observed, heard, or otherwise collected through reliable police channels and the source of that information. Just as important, an officer must identify unknowns and why this lack of information is important to an assessment of the suspect's threat level.

D. With those specific and articulable facts, an officer can then use his or her training and experience to interpret the known information and reach a reasonable conclusion as to the level of threat posed by the suspect. Supported by specific, articulable facts, training, and the officers' ability; they can interpret the information and reach a reasonable use of force decisions based on the threat the suspect poses.

E. This process does not deal with hard certainties, but with probabilities. The use of 20/20 hindsight to analyze an officer's use of force decision is prohibited.

**255.02 PROCEDURES – APPLYING FORCE**

A. When to Use Force

1. Personnel will use only reasonable force necessary to accomplish lawful objectives.

* * *

**255.04 LEVELS OF FORCE**

A. Parameters for Use of Deadly Force - Tennessee v. Garner, 471 U.S. 1 (1985)

1. After weighing the respective interests of law enforcement and the suspect, the United States Supreme Court, in a case entitled Tennessee v. Garner, held that the Fourth Amendment authorized a police officer's use of deadly force in the following circumstance:

   a. Where the officer has probable cause to believe that the suspect poses a threat of death or great bodily harm, either to the officer or others, it is not constitutionally unreasonable to prevent escape by using deadly force.
   b. If the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of death or great bodily harm, deadly force may be used, to prevent escape.
   c. If the fleeing suspect represents a continuous and ongoing threat of death or great bodily harm, deadly force may be used, to prevent escape.
   d. When feasible, some warning has been given.

2. The Supreme Court case Tennessee v. Garner also prohibited the use of deadly force in the following circumstances:

   a. The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable.
   b. It is not better that all felony suspects die than that they escape.
   c. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.

d. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are slower afoot does not always justify killing the suspect.
e. A police officer may not seize an unarmed, non-dangerous suspect by shooting him dead.

3. Police officers are authorized to use deadly force, by any means, to:

   a. Protect themselves or others from an immediate threat of serious physical harm;
   b. Prevent the escape of a felony suspect whom the officer has probable cause to believe that the suspect poses an immediate threat of serious physical harm to the officers or others if allowed to escape;
   c. Where feasible, some warning should be given before engaging in the use of lethal force.

4. Officers should give appropriate medical assistance to injured suspects in circumstances where the officer's safety is no longer in jeopardy.

5. Officers may also discharge a firearm under the following circumstances:
   a. To safely destroy an animal that represents a threat to public safety or as a humanitarian measure where the animal is seriously injured;
   b. During qualifications, range practice, or sporting events.

6. Warning shots are prohibited.

7. Employees should not discharge a firearm at or from a moving vehicle unless it is to protect him/herself or another from what is reasonably believed to be an imminent threat of death or great bodily harm.

8. When the ONLY means of an assault on an officer is by motor vehicle, officers:

   a. Must place him or themselves in the most tactically safe position possible.
   b. Will not purposely place themselves in the path of a fleeing / aggressively driven vehicle to justify the use of deadly force.

9. Firearms will be carried safely and securely per GO 143 Firearms, section 143.11

10. Careless handling of firearms is prohibited.

LCPD Policy GO-255: Use of Force (revised August 31, 2021). **Doc. 48, UMF 1** (one of four facts supported by the record).

There is no evidence showing that LCPD officers had a custom of using deadly force in an unconstitutional, widespread, permanent, and well-settled manner. **Doc. 48, UMF 2**. Nor any

evidence showing that City Defendants' use of force policies or customs were deliberately indifferent to Decedent's Fourth Amendment right against the use of excessive force. **Doc. 48, UMF 3**.

Prior to, and at the time of the April 16, 2022, fatal shooting of Decedent by Defendant Cosper, the following policy governed the assistance of the mentally ill by LCPD officers:

**245 ASSISTING THE MENTALLY ILL**

**PURPOSE**

The purpose of this General Order is to establish guidelines and procedures for assisting mentally ill persons.

**POLICY**

The Las Cruces Police Department (LCPD) shall call upon available resources to help bring a desirable resolution to incidents involving the mentally ill in a responsible and thoughtful manner. The department will call upon a Crisis Intervention Trained (CIT) officer when available.

**APPLICABILITY**

This General Order applies to all employees. This General Order supersedes all previous versions.

* * *

**245.04 ASSISTING MENTALLY ILL PERSONS**

A. When an officer believes that a subject may be mentally ill and a potential threat to him or herself, the officer, others, or may otherwise require law enforcement intervention as prescribed by statute, the following responses may be taken:

1. Ensure that backup officers are present before taking any action.

2. If possible, try to obtain any information on the subject from family or friends.

3. Attempt to calm the situation:

    a. Cease emergency lights and sirens if practical.

    b. Disperse crowds.

c. Approach the person in a quiet, non-threatening manner.

d. Avoid physical contact while assessing the situation.

* * *

**245.06 DEPLOYMENT OF THE CRISIS INTERVENTION TRAINED OFFICERS**

A. The Crisis Intervention Trained (CIT) Officers composed of uniformed and plain clothes officers who function within their respective shifts, units or teams as specialists, trained in handling calls involving the mentally ill, as well as other calls of crisis not related to mental illness.

B. When available, CIT Officers should respond as primary officers to calls meeting the following criteria.

1. Any incident when a mental illness precipitated a response by law enforcement.

2. Any incident when a person poses a risk to themselves or others.

3. Incidents involving grave passive neglect.

C. CIT Officers draw from their training and experience to ensure that an appropriate intervention takes place during and following a crisis response.

**245.07 CRISIS INTERVENTION TRAINED OFFICERS ORGANIZATION AND RESPONSIBILITIES**

A. See CIT Officer's responsibilities include:

1. Attending and successfully completing a CIT training course.

2. Responding, when available, as primary officer to calls in which mental illness is believed to be a factor.

3. Responding, when available, as primary officer to calls when a person represents a danger to him / herself or others.

4. Being responsible for completion of the appropriate documentation.

5. Volunteering to respond to calls for service meeting the criteria outlined in this general order, if such a call is brought to their attention.

6. Working in cooperation with mental health care providers in an effort to ensure that the most appropriate intervention response occurs.

LCPD Policy GO-245: Assisting the Mentally Ill (Most Critical) (revised June 13, 2013), **Doc. 48, UMF 4** (one of four facts supported by the record).

Further, there is no evidence that LCPD officers had a custom of handling the mentally ill in an unconstitutional, widespread, permanent, and well-settled manner. **Doc. 48, UMF 5**. Nor any evidence showing that City Defendants' polices and customs respecting the handling of the mentally ill were deliberately indifferent to Decedent's Fourth Amendment right against the use of excessive force. **Doc. 48, UMF 6**.

## II. City Defendants' training of LCPD officers

To become a certified law enforcement officer in New Mexico, a law enforcement applicant must meet the criteria set forth in the Law Enforcement Training Act, NMSA 1978, § 29-7-6 (1993) ("the Act"). **Doc. 48, UMF 7**. A determination of whether a law enforcement applicant has met the § 29-7-6 requirements is made by the New Mexico Law Enforcement Academy (NMLEA) Board, an entity created by the Act, § 29-7-4. **Doc. 48, UMF 8**. The minimum training standards for law enforcement academy prospects by the Act and the New Mexico Administrative Code ("the Code") consist of a 672-hour curriculum, which includes (1) critical incident management, (2) instruction in handling the mentally ill, (3) defensive tactics, (4) use of force, and (5) handling arrested persons. **Doc. 48, UMF 9**. Individual law enforcement agencies may require additional training. ***Id.*** There is no evidence in the record that Defendant Cosper failed to successfully complete the basic NMLEA law enforcement academy courses. **Doc. 48, UMF 10**.

The Act and the Code also establish continuing in-service training, which is developed by the NMLEA Board and which officers must complete biannually. **Doc. 48, UMF 11**. Individual law enforcement agencies may require additional ongoing training. ***Id.*** There is no evidence in the

record that Defendant Cosper failed to successfully complete his ongoing training requirements. **Doc. 48, UMF 12**.

There is no evidence in the record showing that LCPD failed to train officers according to the Use of Force and Handling the Mentally Ill policies outlined above. **Doc. 48, UMF 14**. Nor any evidence that the training which LCPD officers received was conducted in an unconstitutional manner or failed to instruct officers on the Fourth Amendment standards regarding the use of force. **Doc. 48, UMF 17**. And there is no evidence that the manner in which LCPD trained its officers on the use of force was deliberately indifferent to Decedent's Fourth Amendment right against the use of excessive force. **Doc. 48, UMF 18**.

There is no evidence that LCPD failed to train its officers regarding the Fourth Amendment standards by which an officer must handle a mentally ill citizen. **Doc. 48, UMF 19**. Nor any evidence showing that the training received by LCPD officers was conducted in an unconstitutional manner, or otherwise failed to instruct officers on the proper handling of mentally ill citizens pursuant to the Fourth Amendment. **Doc. 48, UMF 20**. Finally, there is no evidence showing that LCPD trained its officers in manner that was deliberately indifferent to Decedent's Fourth Amendment rights respecting the handling of mentally ill citizens. **Doc. 48, UMF 22**.

## III. Defendant Dominguez's role as Defendant Cosper's supervisor

Defendant Dominguez has been the Chief of the Las Cruces Police Department since November 2021. **Doc. 53, SAMF 1**. Defendant Dominguez has a "major role in forming policies" for LCPD, which must receive his final approval to enact a policy. **Doc. 53, SAMF 2**. Defendant Dominguez is the final authority on officer discipline and internal investigation; other officers charged with investigating discipline may only make recommendations, while Defendant Dominguez must approve any discipline that is meted out. **Doc. 53, SAMF 3**. The Las Cruces City Manager gives ultimate approval on officer discipline, but the City Manager has never refused to

accept a recommendation from Defendant Dominguez. **Doc. 53, SAMF 4**. Defendant Dominguez is the final authority on officer training, and the Las Cruces police academy is under his authority. **Doc. 53, SAMF 5**.

Prior to, and at the time of the fatal shooting, LCPD adhered to the following policies regarding the duties and responsibilities of "Commanding Officers" (rank of lieutenant and above), "Supervisors" (rank of sergeant and above), and "Officers," which required commanding and superior officers to enforce compliance with LCPD policies, procedures, and training:

**108 COMMAND AND SUPERVISION PRINCIPLES**

**PURPOSE**

This General Order explains command and supervision principles and the chain of command of the Las Cruces Police Department.

**POLICY**

Supervisors shall exercise their authority in the best interest of the department, the community, and the employees of the department. Employees assigned to leadership positions shall carry out their duties in a manner that contributes to the department's mission, values, goals, and objectives.

**APPLICABILITY**

This General Order applies to all employees. This General Order supersedes all previous versions.

**REFERENCES**

- CALEA 11.2.1 – 11.3.2
- General Order 103 Code of Conduct
- General Order 141 Reports
- Current contract between the City of Las Cruces and the Las Cruces Police Officers' Association

**108.01 CHAIN OF COMMAND**

A. Chain of command is the order in which authority and responsibility in an organization is delegated from the Chief of Police to every employee at every level of the organization. Instructions flow downward along the chain of command and

accountability flows upward. Each employee is accountable to their immediate supervisor.

B. Some sections or units may not have all levels of authority represented in their chain of command. Generally, only sergeants and above have supervisory authority.

C. The department chain of command is:

1. Chief of Police

2. Deputy Chief of Police

3. Commander

4. Lieutenant / Administrative Services Manager / Chief Codes Officer

5. Sergeant Supervisor

6. Detective / Agent / Police Officer / Code Enforcement Officer / Animal Control Officer / civilian employee

7. Recruit Police Officer

D. Supervisors generally issue orders only to their own immediate subordinate(s). Subordinate supervisors issue or relays orders in the same manner until the point of implementation is reached. Once an order has been implemented, feedback regarding outcome should be relayed up the chain of command to the supervisor who originally issued the order.

E. Due to overlapping work schedules, areas of responsibility, unforeseen emergencies or other circumstances, supervisors may be responsible for issuing orders or directing subordinates not officially in their chain of command. In such cases a courtesy notification to the employee's supervisor shall be made.

F. Supervisors who observe or become aware of any policy violation, act or behavior that is inappropriate may take immediate corrective action to stop and/or mitigate the situation. If the involved employee is outside of the supervisor's span of control, the supervisor shall inform the employee's immediate supervisor of the incident. The supervisors shall discuss the situation and determine who shall notify Internal Affairs if appropriate.

**108.02 SPAN OF CONTROL**

Span of control is the number of subordinates a single supervisor can effectively control. The number of subordinates shall depend on the nature and complexity of the assigned duties.

**108.03 CONFLICTING ORDERS**

Employees who are given a lawful order which conflicts with a previous order, rule, regulation, or directive shall respectfully inform the supervisor issuing the conflicting order of the conflict. If the supervisor issuing the order does not alter or retract the conflicting order, the new order shall stand. Under these circumstances, the responsibility for the conflict shall be upon the supervisor. Employees shall obey the conflicting order and shall not be held responsible for disobedience of the order, rule, regulation, or directive previously issued. Subordinates are not required to follow illegal and/or unethical orders. In such circumstances the subordinate shall notify the next high level in the chain of command of the order.

**108.04 SUPERVISORY RESPONSIBILITIES**

A. Supervisors shall:

1. Closely observe the work performance of their immediate subordinate(s) and be prepared to evaluate that performance. Supervisors shall make a written report of any outstanding work of a subordinate or any misconduct or unfitness of a subordinate.

2. Be familiar with issues that may affect the working conditions and morale of their subordinates and shall inform their superiors of such issues in detail.

3. Keep their subordinates informed of all decisions and information affecting them by disseminating orders, policies, procedures, rules, and regulations.

4. Ensure their subordinates are given all necessary and reasonable assistance and training to discharge their duties.

5. Issue orders to their subordinates necessary to carry out their assigned duties. It is the supervisor's responsibility to ensure instructions are understood by their subordinate.

6. Supervisors shall review the work product of their subordinates to ensure efficiency, effectiveness, and compliance with department mission and goals.

7. Supervisors shall review the reports of all subordinates as outlined in General Order 141 Police Reports.

**108.05 ABUSE OF SUPERVISORY AUTHORITY**

Abuse of supervisor authority consists of the arbitrary and capricious exercise of power by a supervisor that injures or adversely affects the rights of a subordinate by tyrannical, careless, or capricious conduct or continuous and/or severe abusive language.

## 108.06 AUTHORITY AND ORDER OF SUCCESSION

A. When the Chief of Police is absent, he/she shall appoint an acting chief who will have the same responsibilities and authority as the Chief. The acting chief will perform the duties of the Chief of Police. If an acting chief is not appointed the following order of command succession shall apply:

1. Deputy Chief of Operations (DCO)

2. Deputy Chief of Administration (DCA)

3. West Area Commander

4. East Area Commander

## 108.07 ASSIGNMENT OF SUPERVISORY POSITIONS

The Chief of Police retains the authority to assign employees to supervisory positions at his/her discretion and shall ensure that positions are filled by employees holding the appropriate rank. Criteria for determining such assignments may include, but are not limited to, experience level, extent of training, past performance, general ability to perform the required duties, and approved examinations. Temporary appointments may be made by the Chief in the best interest of the department.

## 108.08 TRANSFERS

When a supervisor is transferred, he/she shall assist in transitioning his/her replacement to ensure the change is completed as smoothly and as orderly as possible. The outgoing supervisor shall familiarize the incoming supervisor with the position and assist in maintaining continuity in community and professional contacts. The incoming supervisor should critically review and evaluate all aspects of the position and recommend changes if necessary to improve efficiency and effectiveness.

**108.09 DELEGATION TO SUBORDINATES**

Supervisors may delegate duties to their subordinates unless directed otherwise. Supervisors delegate the authority to complete a task but retain responsibility and accountability for ensuring that the task is properly performed.

**108.10 ABSENCE OF A SUPERVISOR**

A. When a supervisor is absent from any section or unit for an extended period of time, the senior member of the next lower level within the section or unit shall assume command unless an alternate employee has been designated. The employee will retain all duties and responsibilities of the absent supervisor and shall report to the next higher level in the chain of command. If the Chief of Police, or his/her designee, determines that the position is to remain vacated for an extended period of time, he/she may appoint an acting supervisor.

B. Seniority is determined by date of rank or for non-supervisory employees, the length of continuous service within the department and/or length of time within a specialty unit.

**108.11 ASSUMPTION OF COMMAND BY THE DEPUTY CHIEF**

The appropriate Deputy Chief may assume command of any section or unit if necessary. The Chief and all subordinates affected shall be notified immediately.

**108.12 MULTI-SECTIONAL / MULTI-UNIT RESPONSE INCIDENT COMMAND**

A. When responding to field incidents, the first responding officer shall be designated as Incident Commander (IC). The IC shall be responsible for all operations regarding the incident until such time command is relinquished to a commissioned supervisor. Command shall be considered relinquished automatically to the first arriving commissioned supervisor. The IC shall inform the supervisor of all information available regarding the incident when relinquishing command.

B. The department utilizes different specialized sections and units to improve efficiency and effectiveness. The IC shall make use of these specialty units as appropriate and may relinquish command to the officer and/or supervisor of the specialty unit for the part of the incident they have been called to assist with.

**108.13 SENIORITY**

A. When two or more officers of equal rank are assigned together or working together and an emergency arises requiring a command decision, the most senior officer shall assume command if no one has been assigned, or command may be assigned by mutual agreement. Seniority shall be determined by:

1. Rank.

2. Continuous service in that rank.

3. In the event of identical dates of rank, the employees' position on the standing list from which the employees were hired or promoted.

4. If assigned to a specialized section, time in service within that section.

**Doc. 48, UMF 34** (one of four facts supported by the record).

Prior to, and at the time of the fatal shooting, LCPD adhered to the following policy regarding the manner in which it investigated a LCPD officer's arrest of, and use of force against, a person:

**160 COMPLAINT INVESTIGATION**

**PURPOSE**

The purpose of this General Order is to provide employees of the Las Cruces Police Department with an effective system for the reporting, investigation, and conclusion of internal investigations concerning allegations of employee misconduct. This General Order establishes a process for the detection and intake of allegations of misconduct, assignment of responsibility for handling complaints, and the execution of investigative responsibilities.

**POLICY**

It is the policy of the Las Cruces Police Department (LCPD)to thoroughly investigate all allegations of administrative violations, criminal activity, or other alleged misconduct by its employees. All alleged or suspected violations of General Orders, other policies and procedures, and all complaints directed against LCPD employees shall be promptly and thoroughly investigated. Honest, fair, and thorough investigations shall be conducted to ensure the integrity of the organization, the safety of the community, and the rights of citizens and employees alike. While seeking to maintain its integrity and that of its employees, the department will not hesitate to impose disciplinary action on employees, recommend removal from employment an employee who proves to be unfit, and exonerate employees who have acted properly. The department will utilize the appropriate findings and conclusions that are identified in this General Order.

**APPLICABILITY**

This General Order applies to all employees. This General Order supersedes all previous versions.

**REFERENCES**

- CALEA Chapter 52
- NMML ADM.17.03, 19.01 – 19.09
- City of Las Cruces Personnel Manual (PM)
- City Manager's Policies (CMP)
- Current contract between the City of Las Cruces (CLC) and the Las Cruces Police Officers Association (LCPOA)
- Peace Officer's Employer-Employee Relations Act, 29-14-1 thru 29-14-11, NMSA 1978

**160.01 COMPLAINT INTAKE**

A. The public may lodge a complaint against the department or an employee of the department at any time. Complaints can be filed in writing, telephonically, and by electronic communications.

B. Types of Complaints Accepted

1. The LCPD accepts all complaints against employees. Complaints of a non-serious nature that have yet to be made within one hundred eighty (180) days of the incident will not be accepted unless directed by the Chief of Police or the Professional Standards Unit (PSU) Commander.

2. The following types of complaints are also accepted:

a. Complaints made by parents or legal guardians on behalf of minor children.

b. Complaints made by minors:

Personnel taking complaints from minor children shall make a reasonable effort to have the child's parent or guardian present.

c. Anonymous complaints:

Anonymous complaints are investigated at the discretion of the Chief of Police.

d. Misconduct allegations by a third party, at the discretion of the Chief of Police.

C. Complaint Intake Procedures

1. Any person may make a complaint to the LCPD in person, via the telephone, e-mail, the LCPD website, fax, or mail. No complaints will be refused because a complainant wishes to remain anonymous. Letters received alleging employee misconduct shall be forwarded to PSU for review.

2. It is preferred that the complaining citizen complete the citizen complaint form except in cases of telephonic complaints or when the complainant is unable to do so. Under these circumstances, the supervisor's / investigator's responsibility will be to complete the proper form and forward it to PSU for review. All external complaints will be accepted and recorded on a Citizen Complaint Form.

3. Any time a Citizen Complaint Form is completed, it will be forwarded to PSU by the employee or PSU representative, who will take the complaint promptly (generally by the end of the current workday). If a PSU representative is unavailable or the complaint is received after hours, the citizen complaint form may be placed in the Internal Affairs office's mail slot.

4. Whenever an employee initiates a complaint against another employee, the initiating employee will write a memorandum directed through the chain of command to the appropriate Deputy Chief. If the complaint is against one of the complaining employee's supervisors, the complaint will be given directly to the next level of supervision.

D. Delay or Interference with Complaints

Any employee interfering with or delaying the initial investigation or documentation of a complaint shall be subject to disciplinary action up to and including termination at the discretion of the Chief of Police.

E. Normal Business Hours

Complainants coming to the department during normal business hours will be provided with a Citizen Complaint Form by the front station staff. The completed forms will be forwarded to PSU for processing. If a complainant wants to speak with a supervisor or immediate attention is necessary, they will be directed to PSU. A sworn supervisor may be called to take the complaint in the event PSU personnel are unavailable.

F. After Hours

When a complainant contacts an employee after normal business hours, the employee will immediately notify a supervisor who will respond to the scene to speak with the complainant and accept the complaint and/or offer resolution. All supervisors shall have the Citizen Complaint Form available to provide to complainants upon request. If a supervisor is not available, the employee will direct the complainant to the LCPD during normal business hours or direct them to the LCPD website for the Citizen Complaint Form. Upon completion of the Citizen Complaint Form, it shall be forwarded to PSU for follow-up.

G. Complaints of a Serious Nature

If the complaint is of a serious nature or there is potential for loss of physical evidence (i.e. officer involved DWI, officer suspect in a domestic violence investigation, excessive force, or off-duty misconduct, etc), PSU shall be notified. A serious complaint is considered one that may be criminal in nature, one that could result in significant disciplinary action, termination, or one that may result in embarrassment or other concerns to the department.

H. Verification of Complaint Received

Complainants will be contacted and notified that their complaint was received for processing by PSU within forty-eight (48) hours or the first regular working day if received over the weekend or during a holiday.

I. Status Reports on Complaints

If, after forty-five (45) days, a complaint remains open and without disposition, the complainant will be notified by telephone or in person that the investigation is still pending.

**160.02 DUTIES OF THE PROFESSIONAL STANDARDS UNIT**

A. PSU shall act on behalf of, and report to, the Chief of Police as a staff investigative body with the following areas of responsibility:

1. Recording, registering and controlling the investigation of alleged or suspected misconduct within the agency.

2. Investigating or assuring the investigation of alleged or suspected misconduct within the agency.

3. Recording, registering, and maintaining a file of the inspection of procedures, incidents, or activities, in order to monitor performance within the agency.

4. Maintaining the confidentiality of PSU investigations and records.

5. Referring information to the Criminal Investigation Section when an employee is suspected of criminal activity.

6. Making recommendations regarding dispositions on all preliminary inquiries and investigations conducted by the Professional Standards Unit.

7. Monitoring the number of complaints, complaint types, and cumulative sustained incidences of irregularity (i.e. monitor discipline in a staff capacity), and will regularly advise the Chief of Police.

8. Providing staff control for the Chief of Police over administrative investigations delegated to other levels of command.

9. Monitoring and directing the processing and timely handling of all case assignments registered in PSU.

10. Conducting administrative investigations into officer involved shooting incidents and in-custody deaths.

11. Administering and managing the Early Intervention System (EIS) to include two reports annually in January and July. (See also GO 159)

12. Conduct staff inspections/audits regarding procedures and practice. This includes:

    a. An annual audit of 10% of the property held by the agency in the Evidence and Property Room. (See also GO 300)

    b. Unannounced biannual inspections of the property storage areas. (See also GO 300)

    c. An annual audit of the contingency fund. (See also GO 124)

    d. An internal review of the informant files conducted twice a year at least 120 days apart. (See also GO 129)

13. Complete an Annual Statistical Summary.

    The Professional Standards Unit shall compile annual statistical summaries, including offenses investigated, use of force analysis, and any bias-based profiling. The summary may be disseminated at the discretion of the Chief of Police. This summary will be made available to the Chief of Police and will be completed no later than March 31st following the year being reviewed. (See also GO 165, GO 255)

B. Types of Complaints Investigated by the Professional Standards Unit

1. Allegations of serious policy or procedure violations as determined by the Chief of Police shall be investigated by PSU. When deemed appropriate by the Chief of Police, complaints of criminal misconduct may be submitted to the Criminal Investigations Section (CIS) or an outside law enforcement agency for investigation.

2. All complaints of serious negligence or misconduct in the handling of evidence by any members of the LCPD shall be investigated by PSU.

C. PSU Commander Duties

The PSU Commander reports directly to the Chief of Police. The PSU Commander will make immediate notification to the Chief or his/her designee all allegations of serious criminal misconduct against employees. The Chief of Police will be kept informed of all other complaints during regular briefings. The PSU Commander will otherwise oversee all operations of the PSU as conditions warrant.

**160.03 DUTIES OF EMPLOYEES**

A. All employees have an obligation to report any misconduct that comes to their attention to a supervisor. All employees shall cooperate fully in departmental administrative investigations as required in General Orders.
   1. Supervisors shall scrutinize all areas of police action and operations under their command to uncover violations of General Orders or other policies and procedures at the earliest stage.
   2. Allegations of violations of the General Orders as determined by the Chief of Police may be investigated by supervisors.

B. Handling of Complaints and Investigations

   1. Supervisors and assigned investigators are responsible for maintaining the confidentiality of the contents of an investigation under their control.

   2. Supervisors who accept complaints directly or have been summoned to accept a complaint shall:

      a. Attempt to resolve issues that arise from misinformation, misunderstanding, or acceptable police procedure by offering an explanation. If, after the explanation is completed, the complainant is satisfied, and the matter is resolved, no Citizen Complaint Form is necessary.

      b. If the matter is not resolved, the complainant shall complete the Citizen Complaint Form.

      c. A supervisor shall immediately initiate and document a preliminary investigation to include:

         1) Identification of witnesses

         2) Identification of employees involved

         3) Collection of any evidence pertinent to the complaint

         4) Photographs of the complainant or employee if appropriate

5) Arrange for any medical examinations or treatments, if necessary

d. Digitally record all contacts with complainant and attach to Blue Team entry or submit directly to PSU prior to going off-duty.

e. Complete a Blue Team Citizen Complaint entry prior to going off duty.

3. Arrangements shall be made to provide a photocopy of the Citizen Complaint Form to the complainant, if requested.

4. In the event the complainant will not cooperate in the preliminary investigation, the supervisor shall fully document his/her attempt to conduct the investigation and forward this information to PSU.

**160.04 CRIMINAL INVESTIGATIONS**

A. Criminal investigations focus upon alleged or suspected criminal activity by an employee. The Chief of Police shall regularly review the progress of the investigation until criminal charges are filed or refused by competent authority. Criminal investigations will be completed within a reasonable period of time, consistent with the particular requirements and circumstances of each case.

B. If criminal prosecution of an employee is a possibility, the Chief of Police and/or the PSU Commander may enlist assistance from specialized units or outside agencies.

C. Reporting Alleged Criminal Acts

When an employee is made aware that another employee may be involved in criminal activity, or when a citizen alleges criminal acts, the employee shall immediately notify a supervisor or PSU. Supervisors who become aware that an employee may be involved in criminal activity shall not question the employee before, during, or after completion of the criminal investigation. Supervisors shall leave all questioning of the employee to the assigned investigator or agency conducting the investigation.

D. Disclosure of Criminal Investigations

The contents of a criminal investigation in which a criminal complaint has been issued shall be disclosed in accordance with applicable law as well as state and federal rules of criminal procedure. No reference to unsubstantiated criminal allegations shall be placed in an employee's personnel file maintained by either the City Human Resources Department or the LCPD, whether by direct reference or within an evaluation.

E. Disciplinary Action

Acquittal on a criminal charge does not prevent the department from taking appropriate administrative action against an employee. Allegations of a criminal nature may cause a criminal investigation to occur as well as an administrative investigation.

**160.05 ADMINISTRATIVE INVESTIGATIONS**

A. Administrative investigations are non-criminal investigations. Criminal investigations regarding alleged or suspected criminal activity by an employee shall always supersede administrative investigations. Unless otherwise directed by the Chief of Police, administrative investigations shall begin immediately upon completion of the criminal investigation, without respect to the final adjudication of the criminal charge. Suspension of a criminal investigation for any reason or the termination of employment of any focus employee or witness employee does not preclude the initiation of an administrative investigation.

B. The department will strive to complete administrative investigations within ninety (90) calendar days of distribution to an assigned investigator. Requests for extension must be made in writing to the PSU Commander and / or Chief of Police and include the reason for the extension request. Such requests, and their responses, shall become part of the investigative file.

C. Types of investigations:

1. Internal Investigations (II)

Internal Investigations (II) are generated for a variety of reasons and are generally initiated within the department. This type of investigation may result when there is an internal allegation related to misconduct or operational actions of employees on or off-duty. Internal Investigations may be derived from a concluded criminal investigation or from some other source within the agency. Generally, unless serious or complex in nature, these operational concerns are investigated by the employee's chain of command and then forwarded to PSU for tracking and filing. In the latter instance, the Chief of Police or his/her designee shall authorize an investigation. PSU shall be responsible for conducting Internal Investigations of a serious nature.

2. External Investigations (EI)

External Investigations (EI) may be categorized by two separate methods: Formal or Informal. These investigations are generated when a citizen makes an allegation of misconduct of a serious or non-serious nature, or non performance of duty against an employee. Examples of this type of investigation would include allegations such as excessive force, illegal search

and seizure, false arrest, civil rights violations, quality of service, professionalism, attitude, disparate treatment, or unresponsiveness to the community.

a. Category 1 (Formal)

The Professional Standards Unit will document and investigate External Investigations (EI-C1) that require extensive follow up. This may include complaints involving three or more non-departmental witnesses, complaints that are pending civil litigation, or other complaints as directed by the Chief of Police or the PSU Commander. An internal due date of 90 days shall be assigned.

b. Category 2 (Informal)

Category 2 External Investigations (EI-C2) involve allegations of a non-serious nature where the citizen elects not to pursue a formal investigative process. The citizen may simply request notification be made to the supervisor for informational purposes only. The complaint will be classified as an EI-C2 and closed within PSU.

c. Category 3

Category 3 External Investigations (EI-C3) involve allegations of a non-serious nature where the citizen is unable to articulate a bona fide complaint. Additionally, this category is used for concerns regarding police conduct that do not rise to the level of a Formal or Informal External Investigation due to a lack of valid facts or no apparent General Order violations. This category of investigation will be closed within PSU as an EI-C3.

**160.06 ADMINISTRATIVE LEAVE**

A. If the Chief of Police or his designee determines that the needs of the employee and/or department require a temporary relief from duty, then an administrative leave may be implemented and shall continue until otherwise ordered by the Chief or his designee. An administrative leave under these circumstances is not considered to be discipline.

B. Administrative Leave Following Use of Deadly Force

In every instance in which an officer uses deadly force or takes action, which results in death or great bodily injury to another person, the officer will be immediately relieved of normal duties in order that the personal and emotional needs of the officer may be addressed and all facts surrounding the incident verified. A minimum of three (3) days of paid administrative leave will be provided with the option of additional paid leave being offered at the discretion of the Chief of Police.

**160.07 INVESTIGATIVE PROCEDURES**

A. Preliminary Inquiry

1. The Professional Standards Unit will review each complaint to determine its merit. Prior to initiating an official administrative investigation and notification of the affected employee, a preliminary inquiry may be made to identify the involved employee, to verify the reliability of the source or authenticity of the complaint, or to clarify the allegations.

   A preliminary inquiry may not be necessary for certain types of complaints. *(Example: A disagreement over the validity of a traffic citation or parking ticket is not normally grounds for a complaint but is a matter for adjudication by the proper court system.)* Similarly, the Chief of Police may order an administrative investigation without a preliminary inquiry at his/her discretion. PSU will strive to complete a preliminary inquiry within ninety (90) calendar days of distribution to an assigned investigator.

2. In some cases, the preliminary inquiry of the complaint will determine that the action(s) of the employee were in compliance with policy or that the complaint against the employee is one that, even if true, would not be a violation of law or department policy. In these situations, a formal administrative investigation is not needed and the complaint can be closed out upon the Chief of Police's approval.

3. If the preliminary inquiry determines that a specific allegation, if true, would constitute violation of policy and/or procedure, a formal administrative investigation will be initiated in accordance with this general order.

B. Training Referral

A Training Referral may exist when an employee is in need of additional training discovered as a result of the preliminary inquiry or an administrative investigation. A Training Referral is non-serious, non-disciplinary in nature, and is used as an educational tool. Training Referrals shall be documented by the employee's supervisor in a memo addressed to the PSU Commander/Lieutenant.

C. Supervisory Matter

A non-serious incident/investigation typically conducted at the shift level for minor infractions that is not investigated by PSU. The Supervisory Matter will be filed with PSU for record purposes only, these investigations can lead to penalties as outlined in the LCPOA Contract Section 33.Timelines for Supervisory Matters will be consistent with 160.05.

D. Purpose and Method of an Administrative Investigation

1. The objective of an administrative investigation is to determine the truth and factual circumstances concerning each allegation(s). All investigations shall be conducted with full regard for the employee's Constitutional and legal rights and the Peace Officer Employer-Employee Relations Act.

2. Criminal investigations shall be conducted in accordance with General Orders and applicable laws. Non-criminal investigations shall be conducted in accordance with standard investigative techniques. Investigations may include the taking of statements, the gathering and preserving of evidence, and the recording of all information.

3. Investigators assigned to any administrative investigation will:

   a) Make a reasonable effort to record the complainant's statements using equipment that captures audio, video, or both.

   b) Complete assignments within directed time frames or receive approval for extension from the Chief of Police.

   c) Make a reasonable effort to contact and document all information sources relating to an assignment. If sources or witnesses prove to be unavailable, all efforts to contact them will be documented and made part of the investigative file.

   d) Make a reasonable effort to obtain all available and pertinent information relating to an assignment and add to or prepare an investigative file.

   e) Prepare an investigative report using the following format (bolded font and capitalization indicates appropriate headings):

      1) **COMPLAINTSUMMARY -** An outline of the alleged conduct, the complainant's name, and the date received by the assigned investigator**.**

      2) **FACTS -** A detailed breakdown of significant facts and information learned from each person interviewed as well as information concerning significant facts and information learned from any examination of relevant reports, diagrams, photographs, video, audio, or other evidence.
      3) **ANCILLARY ISSUES -** Reference made to other issues developed during the investigation, if any, including but not limited to General Order's violations or other violations of policies and procedures not related to the actions alleged on the original complaint.

      4) **FINDINGS AND CONCLUSIONS -** Findings and conclusions drawn by the investigator based on the information received that tend to support or refute the allegation(s).

**5) RECOMMENDATION -** Includes a recommended disposition for each alleged action listed on the complaint as established in General Order 160.12 Dispositions, noting specific violations of General Orders or other violations of policies and procedures, if any, as shown by the evidence.

***Note:*** *Investigative opinions are allowable in the prepared investigative report or preliminary inquiry report.*

E. Peace Officer's Employer-Employee Relations Act

The Peace Officer's Employer-Employee Relations Act shall be applied and adhered to throughout the procedures in this section and others.

F. Garrity Warning

Whenever applicable, the Garrity Warning will be read to the employee. The Garrity Warning is applicable when there is a reason to believe that a criminal investigation could result from the information obtained and reads as follows:

*"I wish to advise you that you are being questioned as part of an administrative investigation of the Las Cruces Police Department. You will be asked questions specifically directed and narrowly related to the performance of your official duties or fitness for office. You are entitled to all the rights and privileges guaranteed by the laws and the Constitution of this State and the Constitution of the United States, including the right not to be compelled to incriminate yourself. I further wish to advise you that if you refuse to testify or to answer questions relating to the performance of your official duties or fitness for duty, you will be subject to departmental charges which could result in your dismissal from the Las Cruces Police Department. If you do answer, neither your statements nor any information or evidence which is gained by reason of such statements can be used against you in any subsequent criminal proceeding. However, these statements may be used against you in relation to subsequent departmental charges."*

If an employee is compelled by the threat of possible job loss to make a statement, then neither the statement itself nor the "fruits" of such statement can be used against the employee in any subsequent criminal proceeding.

G. Time Allotments and Extensions

All investigations shall be thoroughly conducted in a timely and professional manner. The department shall strive to complete administrative investigations within ninety (90) calendar days of distribution to an assigned investigator. The ninety (90) day period shall include time for administrative review. An extension of up to thirty (30) days may be granted for justifiable reasons by the PSU Commander. If the assigned investigator feels that more time is needed to

complete the investigation, specific reasons will be given to the PSU Commander in writing prior to the deadline. All requests for extension shall become part of the investigative file. All completed investigations shall be submitted directly to the PSU Commander.

H. Investigative Personnel

1. Assignment of all investigations shall be made with due regard to the sensitivity of personal and professional relationships. At the discretion of the Chief of Police, a criminal investigation may be conducted by a law enforcement agency other than LCPD.

2. Administrative Investigations shall be conducted only by the Chief of Police or his/her designee (which includes the PSU and any other delegated division, section, or unit).

I. Employee Notification and Investigative Scope

1. When an employee is the focus of an administrative investigation, they will be advised of the allegation(s) against them and provided information relating to their rights and responsibilities relative to the investigation.

2. At the Chief's discretion, it may be advisable to place the employee on administrative leave with pay pending the outcome of the administrative investigation whenever it is apparent that the nature of the charges demonstrates a risk to the integrity of the investigation and the department as a whole.

3. Interrogations of employees with respect to allegations of misconduct shall be limited in scope to activities, circumstances, or acts pertaining to the specific allegations being investigated. Employees shall provide complete and truthful information regarding the incident under review as required in General Orders.

J. Conduct and Recording of Interviews

1. Interviews of commissioned employees shall be conducted in accordance with the New Mexico Peace Officer's Employer-Employee Relations Act.

Generally, interviews will be conducted in the following sequence: complainant, witnesses, and then the focus employee. Reasonable efforts shall be made to conduct interviews of an employee during his or her normal waking hours unless the urgency of the investigation requires otherwise. If an employee is contacted personally or by telephone outside of scheduled work hours, compensation shall be made in accordance with policy. Employees shall be advised prior to an interview whether the interview relates to a criminal investigation or an administrative investigation and whether or not they are the focus of the investigation.

2. Focus officer interviews shall be recorded using audio equipment, video equipment, or both. Equipment for the official recording shall be the responsibility of the assigned investigator.

K. Employee Rights to Counsel

1. Employees have the right to have counsel of their choice present during any interview involving allegations of criminal activity against them. Employees who are not the subject of a criminal investigation, but are interviewed as witnesses or other parties, do not have the right to the presence of counsel during any interview.

2. Employees do not have the right to have counsel present during interviews involving any administrative investigation. Interviewers shall exercise care to see that safeguards are maintained in the current contractual agreement between CLC and the LCPOA. LCPOA represented employees may have a LCPOA representative present at the interview. The representative must be a represented LCPD employee identified in the LCPOA Collective Bargaining Agreement. The representative may not answer questions on behalf of the employee.

L. Employee Requirements

1. Employee(s) who are the subject of a criminal investigation shall not be required by the department to answer questions or submit to examinations or tests in violation of their Constitutional Rights.

2. Employees are required to answer questions, submit to tests, or render materials and relevant statements to a competent authority in any administrative investigation pertaining to an employee's function, work responsibility, or position-related activity as required by General Orders. Failure to comply constitutes insubordination and may subject the employee to further discipline up to and including termination.

**160.08 TEST OPTIONS**

A. The department may require or offer any of the following tests or investigative steps during the course of an administrative investigation by the Professional Standards Unit.

1. Polygraph Examination

a. After reviewing all the information collected in the course of an investigation of a peace officer, the Chief of Police may order the officer to submit to a polygraph examination administered by a licensed polygraph examiner provided that all other reasonable investigative means have been exhausted and the officer has been advised of the administrator's reasons for ordering the polygraph examination.

b. The examination shall be limited to the specific issue(s) under investigation. A licensed polygraph examiner designated by the Chief of Police shall administer the examination.

2. Medical or Laboratory Examination

Upon order of the Chief of Police, an employee is required to submit to a medical or laboratory examination when involved in a sensitive or serious administrative investigation. The examination shall be limited to the specific issue(s) under investigation and the employee shall be informed of the issue items before the administration of the examination. The examinations shall be administered only by competent medical or laboratory personnel designated by the Chief of Police.

3. Photographs

Photographic lineups of departmental employees may be used in administrative investigations as long as precautions are taken to avoid suggestibility. Current accepted investigative practices regarding photographic lineups shall be followed.

4. Physical Lineups

Upon order of the Chief of Police, an employee shall be required to stand in a physical lineup for identification purposes in any sensitive or serious administrative investigation.

5. Chemical Breath/Blood Tests

Chemical Breath / Blood testing will be conducted in accordance with current City of Las Cruces Policy.

**160.09 FINANCIAL DISCLOSURE STATEMENTS**

A. A peace officer shall not be required by the department to disclose information regarding his or her financial status unless all other reasonable investigative means have been exhausted or except as otherwise required by law.

B. When all other reasonable investigative means have been exhausted or except as otherwise required by law, and upon order of the Chief of Police, an employee is required to submit a full financial disclosure statement when involved in a sensitive or serious non-criminal administrative investigation. The order for disclosure shall be limited to the specific issue(s) under investigation and the employee shall be informed of the items at issue before the request for disclosure.

## 160.10 OTHER INVESTIGATIVE STEPS

Depending on the nature of the allegations, other investigative steps may be warranted. These steps are to be carried out in accordance with applicable General Orders, City of Las Cruces administrative directives, LCPOA contractual requirements, New Mexico State Statutes, and the Constitution of the United States.

## 160.11 INTEGRITY OF REPORTS

Employees shall not remove any original report from an investigative file once the report has been submitted, reviewed, and approved at any administrative level. Any modifications to reports in investigative files shall be done by an addendum in the appropriate report format. All reports become a permanent part of the investigative file.

## 160.12 DISPOSITIONS

**Recommendations and Disposition Options -** The following dispositions are available for investigators to use at the conclusion of their assigned administrative investigations:

1. **SUSTAINED -** conduct alleged apparently occurred and amounts to a violation of General Orders or other city policy or procedure.

2. **SUSTAINEDOTHER –** the employee was determined to have committed a violation other than was originally alleged.

3. **NOT SUSTAINED -** insufficient evidence exists to clearly prove or disprove allegation.

4. **UNFOUNDED -** act alleged apparently did not occur.

5. **EXONERATED -** employee's conduct was lawful, justified and proper.

6. **OFFICER INVESTIGATION -** complainant failed to cooperate with the investigation and there is not enough evidence available to draw a fair conclusion and apply a finding.

**160.13 CHAIN OF COMMAND REVIEW**

Decisions on disciplinary action on an employee are generally made following a review of the circumstances and recommendations by the employee's chain of command. The Chief of Police approves or disapproves all recommended disciplinary action. The assigned investigator(s) shall not make recommendations regarding disciplinary action.

**160.14 EMPLOYEE NOTIFICATION**

After the completion of an administrative investigation, the focus employee shall be notified of the disposition via PSU.

**160.15 CITIZEN NOTIFICATION**

The complainant shall be sent written notification of the disposition of the complaint via a letter from the Chief of Police, preferably within thirty (30) days of completion of the investigation. The letter shall advise only of the disposition(s) of the act(s) alleged.

**160.16 PSU RECORDS**

A. Records Maintained in the Professional Standards Unit

The Professional Standards Unit shall maintain copies of all administrative investigations in a secure area. The PSU Commander is the custodian of these records.

B. Annual Statistical Summaries

The Professional Standards Unit shall compile annual statistical summaries, including offenses investigated, for dissemination at the discretion of the Chief of Police. This summary will be made available to the Chief of Police and will be completed no later than March 31st.

**160.17 PURGING OF FILES**

Investigative files maintained by PSU will be purged in accordance with applicable state records retention laws after a review has assured no pending litigation exists involving any file scheduled for destruction. This purging should be accomplished on an annual basis. If litigation is pending, the involved files will not be purged until the litigation has been resolved.

**160.18 ATTACHMENTS[10]**

ATTACHMENT A: Citizen Complaint Form
ATTACHMENT B: Investigative Memo

[10] The attachments can be found in Exhibit D of **Doc. 48**.

ATTACHMENT C: IA Training Refer

**Doc. 48, UMF 35** (one of four facts supported by the record).

There is no evidence in the record that LCPD had a custom of failing to adequately supervise or investigate LCPD officers' uses of deadly force. **Doc. 48, UMF 36**. There is also no evidence showing that LCPD's officer misconduct and investigation policies or customs were deliberately indifferent to Decedent's Fourth Amendment right against the use of excessive force. **Doc. 48, UMF 37**. And there is no evidence that LCPD's supervision of Defendant Cosper was unconstitutional or failed to identify Defendant Cosper's alleged misconduct nor impose corrective action when appropriate. **Doc. 48, UMF 38**.

Although the Department has not yet initiated a formal investigation of Defendant Cosper's shooting of Decedent, this decision adheres to Department policy, under which the Department waits to see whether the Attorney General's Office will criminally charge the officer before initiating its own investigation. **Doc. 53, SAMF 6**. Defendant Dominguez has reviewed virtually all the evidence related to the shooting, including Defendant Cosper's and Officer Fierro's lapel videos, as well as reports related to the incident. **Doc. 53, SAMF 7**. And an Officer-Involved Shooting Task Force composed of investigators from other law enforcement agencies investigated the shooting and presented findings to a district attorney's office with Defendant Dominguez in attendance. **Doc. 53, SAMF 8**. Defendant Dominguez is not involved with the task force's investigation, but he reviews their findings. **Doc. 53, SAMF 9**.

Based on what he has seen, Defendant Dominguez's informal opinion is that Defendant Cosper should not be charged with a crime, **Doc. 53, SAMF 10**.[11] Indeed, Defendant Dominguez

---

[11] To date, no one in the Department has been disciplined as a result of the shooting. **Doc. 53, SAMF 11**.

believes Defendant Cosper fully complied with a range of policies that apply to LCPD officers.[12] **Doc. 53, SAMF 12–25**.

Defendant Dominguez is "not concerned" that Defendant Cosper did not try to communicate with dispatch as he drove to Decedent's house. **Doc. 53, SAMF 26**. Defendant Cosper's lapel video captures his actions in the minutes leading up to and at the moment that he fatally shot Decedent. **Doc. 53, SAMF 27**.

Finally, there is no evidence that LCPD failed to take corrective action when it had actual knowledge of prior civil rights violations by LCPD officers, including Defendant Cosper. **Doc. 48,**

[12] The full list included in the Estate's facts are: (1) that officers aren't required to carry tasers and OC spray which are issued to them, **Doc. 53, SAMF 12**; (2) the Department's policy on de-escalation, which requires personnel to "look for opportunities for de-escalation . . . ," **Doc. 53, SAMF 13**, and includes (A) verbal de-escalation, (B) the use of intermediate barriers, (C) using distance and time to assess the situation and generate alternatives, (D) calling additional officers, (E) communicating in a conversational tone, and (F) asking questions rather than issuing orders, **Doc. 53, SAMF 14**; (3) GO-255.03(C), which requires officers to "attempt to deescalate and sole down situations without increasing the risk of harm to the officer or others," **Doc. 53, SAMF 15**; (4) GO-255.03(C)(2), which requires officers to "gather information about the incident and assess potential risks to the individuals, the officers and others," **Doc. 53, SAMF 16**; (5) GO-255.03(D), which requires officers dealing with a noncompliant person to "consider whether that lack of compliance is based on an inability to comprehend or comply," while also requiring officers to "use de-escalation techniques" where the person has "a known or apparent mental illness" or is "experiencing a crisis incident," **Doc. 53, SAMF 17**; (6) GO-255.03(E), which advises officers that the way they approach an individual can influence whether the situation escalates and requires them to avoid taking unnecessary actions that may lead to the use of force, **Doc. 53, SAMF 18** (Defendant Dominguez does not believe Defendant Cosper's approach to the Decedent escalated the situation. **Doc. 53, SAMF 19**); (7) GO-255.03(H), which provides that officers "should attempt to de-escalate" situations involving a person who appears to be suffering from a mental health crisis, **Doc. 53, SAMF 20**; (8) GO-245 Assisting the Mentally Ill, **Doc. 53, SAMF 21**; (9) GO-245.04(A)(2), which permits officers to obtain information on the person from family and friends, **Doc. 53, SAMF 22**; (10) GO-245.04(A)(3), which permits officers to "attempt to calm the situation," **Doc. 53, SAMF 23**; (11) GO-245.04(A)(3)(c), which permits officers to approach a mentally ill person in a nonthreatening manner, **Doc. 53, SAMF 24**; and (12) GO-245.04(A)(3)(f), which permits officers responding to a mentally ill person to use appropriate communications such as providing reassurance and attempting to find out what is bothering them, **Doc. 53, SAMF 25**. The final four policies listed (9-12) were characterized as "requirements" by the Estate. They are more fairly described as options available to officers responding to persons suffering from behavioral health crises, and the Court has reflected that in its description of the facts.

**UMF 39**. Prior to the incident in question, neither the LCPD Internal Affairs unit nor any LCPD supervisor had determined that Defendant Cosper's detentions or arrests were illegal or violated LCPD's policies or procedures, **Doc. 48, UMF 41**, nor that his uses of force were ever excessive or violated LCPD's policies and procedures, **Doc. 48, UMF 41**. Finally, there is no evidence that LCPD's supervision of its officers, including Defendant Cosper, was deliberately indifferent to Decedent's Fourth Amendment rights. **Doc. 48, UMF 41**, **42**.

## DISCUSSION

Section 1983 provides that any person acting under color of state law who "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." 42 U.S.C. § 1983. As the Supreme Court established in *Monell v. Dep.'t of Soc. Servs.*, 436 U.S. 658 (1978), "a municipality 'is a person subject to § 1983 liability.'" *Burke v. Regalado*, 935 F.3d 960, 998 (10th Cir. 2019) (quoting *McDonald v. Wise*, 769 F.3d 1202, 1215 (10th Cir. 2014)). A police chief whose subordinate commits a constitutional violation is also a person subject to § 1983 liability. *See Burke*, 935 F.3d at 997.

Accordingly, the Court considers the liability under § 1983 of both the City and Defendant Dominguez. Because the Estate has failed to demonstrate a genuine dispute of material fact with respect to § 1983 liability for either Defendant, the Court grants City Defendants' Motion for Partial Summary Judgment.

### I. <u>The City of Las Cruces is not liable under § 1983 municipal liability for Defendant Cosper's use of excessive force</u>

To establish municipal liability, a plaintiff must show an underlying constitutional violation that resulted from a municipal policy or custom.[13] *Murphy v. City of Tulsa*, 950 F.3d 641, 644 (10th Cir. 2019) (citing *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993)); *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) ("[T]o establish municipal liability, a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged."). The Tenth Circuit has identified at least five potential sources for a municipal policy or custom: (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by a written law or express municipal policy is so permanent and well-settled as to constitute a custom or usage with the force of law; (3) the decision of a municipal employee with final policymaking authority; (4) a policymaker's ratification of a subordinate employee's action; and (5) a failure to train or supervise employees. *Murphy*, 950 F.3d at 644 (cleaned up).

In this case, the Tenth Circuit has already determined that there is a triable issue of fact regarding whether there is an underlying constitutional violation. *Baca*, 128 F.4th at 1321. Therefore, this Court is left only to consider whether a municipal policy or custom was the "moving force" or "direct cause" of the alleged Fourth Amendment violation." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 820 (1985). Of the five potential sources of a policy or custom, the

[13] In its Response, the Estate claims that because Defendant Cosper's actions were "objectively unreasonable" and violated Decedent's constitutional rights, the municipal liability claim survives City Defendants' Motion for Summary Judgment. *See* **Doc. 53 at 7–8**. This confuses a necessary condition for a sufficient one. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (*per curiam*); *Trigalet v. City of Tulsa*, 239 F.3d 1150, 1156 (10th Cir. 2001). At this stage, there must be a genuine dispute that a constitutional violation occurred. But there must also be a genuine dispute the violation resulted from a policy or custom.

Estate identifies only two as applicable here: (1) Defendant Dominguez's ratification of Defendant Cosper's action and (2) the City's failure to train or supervise its officers.[14]

Because the Estate has failed to raise a genuine dispute of material fact that either Defendant Dominguez's ratification of Defendant Cosper's action or the City's failure to train and supervise its officers caused Defendant Cosper to use excessive force, the Court finds that the City is not liable under § 1983 as a matter of law.

### A. The Estate has failed to show that Defendant Dominguez ratified Defendant Cosper's actions, nor that any such ratification caused the deprivation of Decedent's Fourth Amendment rights

"Municipal liability may [] be based on the . . . ratification by [] final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010) (internal citations omitted). "However, a municipality will not be found liable under a ratification theory unless a final decisionmaker ratifies an employee's specific unconstitutional actions, as well as the basis for these actions." *Bryson*, 627 F.3d at 790; *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."). "Failing to adequately investigate or punish does not count as ratification." *Lynch v. Bd. Cnty. Comm'rs.*, 786 F.App'x 774, 787 (10th Cir. 2019).

[14] Prior to, and at the time of, Defendant Cosper's fatal shooting of Decedent, the City maintained formal policies governing both the use of force by their officers as well as their officers' handling of the mentally ill. Both of these policies comport with the Fourth Amendment and therefore could not have caused Defendant Cosper to unconstitutionally use excessive force against Decedent. *See generally* UMF 1, 4. The Estate has not pointed to any evidence suggesting that there were concurrent, formal and improper policies that might have caused Defendant Cosper to use excessive force. Nor has the Estate pointed to any widespread informal practice that might constitute a custom. Finally, the Estate does not argue that Defendant Cosper had final policymaking authority.

Since the Estate has not shown that Defendant Dominguez ratified Defendant Cosper's conduct, the City is not liable for Defendant Cosper's actions.

1. The Estate's request to amend the Complaint to include the ratification theory is granted

Before analyzing the ratification theory, the Court notes that it was not raised in the Complaint, but only for the first time in the Estate's Response to the Motion for Partial Summary Judgment. The Court treats this new argument as a "request to amend the complaint" pursuant to Fed. R. Civ. P. 15. *Adams*, 30 F.4th at 971 (quoting *Martinez*, 347 F.3d at 1211). The Court has broad discretion to grant or deny this request. *Martinez*, 347 F.3d at 1212. "As a general rule, a plaintiff should not be prevented from pursuing a valid claim just because she did not set forth in the complaint a theory on which she could recover" as long as this late inclusion does not "prejudice" the defendant. *Evans*, 936 F.2d at 1090–91 (internal quotation omitted). Here, the Court believes that City Defendants are not prejudiced by the inclusion of the ratification theory for the first time in the Estate's Response. City Defendants were given four weeks to submit their Reply to the Response, which was ample time to develop counter arguments to the Estate's theory of liability. Accordingly, the Court grants what is effectively the Estate's Motion to amend its Complaint and considers whether the City is liable under a ratification theory.

2. The Estate's ratification theory fails as a matter of law

The ratification theory analysis begins with the inquiry whether a government employee is a final policymaker. This "is a legal issue to be determined by the court based on state and local law." *Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir. 1995) (citing *Praprotnik*, 485 U.S. at 124). "In deciding whether an official is a final policymaker [the Tenth Circuit] is interested only in delegations of *legal* power." *Brammer-Hoelter*, 602 F.3d at 1189 (internal citation omitted) (emphasis in original). Accordingly, the Tenth Circuit has laid out three factors to help courts

determine whether an individual is legally a final policymaker: "(1) whether the official is meaningfully constrained by policies not of the official's own making; (2) whether the official's decisions are final—*i.e.*, are they subject to meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." *Id.* at 1190–91 (quoting *Randle*, 69 F.3d at 448).

Defendant Dominguez, who has been LCPD Police Chief since November 2021, **Doc. 53, SAMF 1**, was the final policymaker over LCPD's use of force policy at the time of the shooting. First, when it comes to determining use of force policies, Defendant Dominguez is not constrained by policies not of his own making. He and his administration team have full discretion to "see if there's a policy that needs to be created," and to "come up with [the] policy." ***See*** **Doc. 53, Ex. 1 at pp. 10:1–5**. The only hint of a constraint is that the policy is "give[n] to [the] policy review folks, the compliance section." ***Id.*** **at 5–6**. But without any clue in the record what this compliance process is meant to accomplish, nor any argument from City Defendants that any such compliance process meaningfully limits Defendant Dominguez's discretion to enact policy, the Court finds that his policy decisions are not meaningfully constrained.

Second, Defendant Dominguez has final approval over the enactment and revision of department policies. **Doc. 53, SAMF 2**.[15] And although the City Manager has final say on disciplinary decisions, **Doc. 53, Ex. 1 at pp 11:15–16**, this review process is illusory, rather than meaningful, for the City Manager has never disagreed with or overruled Defendant Dominguez's final recommendation on officer discipline, ***id.*** **at pp 11:13–23**; *see also Randle*, 69 F.3d at 449

[15] The record fails to explain that this authority is grounded in the department's General Order 163, which gives the Police Chief final review and approval of every department policy. *See* GO-163.02(E). This omission is not damaging to the Estate's argument, however, as the parties both agree that Defendant Dominguez has final approval for department policies. ***See*** **Doc. 53, SAMF 2; Doc. 56 at 3**.

(quoting *Flanagan v. Munger*, 890 F.2d 1557, 1569 (10th Cir. 1989)) ('"For all intents and purposes the Chief's discipline decisions are final, and any meaningful administrative review by the City Council or City Manager is illusory.'").

Finally, although the record is silent about whether Defendant Dominguez's policy decisions are made within his grant of authority—this evidence is in the City Charter and GO 163, neither of which are in the record—the first two factors carry the day. The Court finds that Defendant Dominguez is a policymaker with respect to the use of force policy that allegedly caused Defendant Cosper to violate Decedent's Fourth Amendment rights.

Although Defendant Dominguez was the final policymaker with respect to LCPD's use of force policies, the Estate has failed to show that he ratified Defendant Cosper's actions and the basis for them when he signaled approval of his conduct in a deposition. According to the Estate, "[Defendant] Dominguez's deposition testimony makes his and the City's position very clear: as far as they are concerned, [Defendant] Cosper did nothing wrong when he approached Ms. Baca and killed her." ***Id.* at 9**. However, in his deposition, Defendant Dominguez clarifies that he has not seen all the evidence. **Doc. 53, Ex. 1 at pp 16:18–18:08; 24:08–25:03**. He also clarifies that any formal conclusion about whether Defendant Cosper adhered to LCPD's use of force policy—and any recommendation respecting discipline that Defendant Dominguez would make to the City Manager—will come only after a formal investigation, which has not yet begun. ***Id.* at pp 15:18–16:16; 23:03–23:10**.

While Defendant Dominguez testified that, based on his review of Defendant Cosper's bodycam video, he believes Defendant Cosper followed the department's use of force and handling of the mentally ill policies, **Doc. 53 at SAMF 13–20**, it would be a mistake to elevate these isolated statements of approval in a deposition to the status of ratification. For one, he qualified these

statements by saying that they do not constitute a formal decision based on all the evidence. **Doc. 53, Ex. 1 at pp 15:18–16:16; 16:18–18:08; 23:03–23:10; 24:08–25:03**. They are merely initial impressions, not final and definitive statements of approval. Moreover, the purpose of these statements could simply have been to disclaim liability in litigation—that is hardly evidence that an informal policy sanctioning the excessive use of force exists at LCPD. Such evidence would look more like Defendant Dominguez's contemporaneous awareness of Defendant Cosper's actions coupled with ongoing support for those actions that predate the deposition. That is the kind of evidence the Tenth Circuit relied on in *Jensen v. West Jordan City* to conclude that West Jordan's Police Chief ratified his officer's conduct. 968 F.3d 1187, 1205 (10th Cir. 2020). There, the Police Chief was aware of his officer's actions and of the basis for them—animus towards the Plaintiff. *Id.* Here, however, there is no evidence that Defendant Dominguez supported or approved of Defendant Cosper's conduct until he was made to answer questions under oath. He never told Defendant Cosper—nor anyone else for that matter—that Defendant Cosper had done a good job. Indeed, a few isolated statements of approval first made in a deposition do not demonstrate that Defendant Cosper adhered to City policy. Concluding differently would disturb the underlying principles of *Monell* liability, which is premised on a finding that the City itself "officially sanctioned or ordered" the underlying constitutional violation. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). This Court refuses to adopt a version of the ratification theory that stretches *Monell* past its breaking point.

But even if Defendant Dominguez had ratified Defendant Cosper's conduct, the Estate has failed to show a genuine dispute of fact regarding the causation requirement. To impose municipal liability, it is not sufficient to identify a policy or custom via ratification; there must also be "a direct causal link between the policy or custom and the injury alleged." *Bryson*, 627 F.3d at 788.

Here, where the only evidence of Defendant Dominguez's potential ratification occurred after the incident, it is not possible that his ratification caused Defendant Cosper's conduct. *Cf. Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009) ("As for any failure to discipline [the officer] basic principles [sic] of linear time prevent us from seeing how conduct that occurs *after* the alleged violation could have somehow caused the violation.") (emphasis in original).[16]

Accordingly, the Estate has failed to show a genuine dispute of material fact with respect to whether the City is liable under § 1983 municipal liability for the alleged violation of Decedent's Fourth Amendment right against the use of excessive force.

**B. The Estate has failed to establish that the City was deliberately indifferent to the rights of persons served by its officers**

Municipal liability can also be based on a failure to train officers. *City of Canton v. Harris*, 489 U.S. 378, 379 (1989). However, liability for failure to train may only be imposed "upon proof of 'deliberate indifference.'" *Murphy*, 950 F.3d at 651 (quoting *Barney*, 143 F.3d at 1307). This

[16] Requiring a showing of causation after a plaintiff demonstrates ratification creates an insurmountable hurdle for the plaintiff whenever that ratification is post-hoc. Such an insurmountable requirement seems to conflict with *Praprotnik*'s much more forgiving formulation, which, on its face, lacks a causation requirement entirely. 485 U.S. at 127 ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."); *see also Brammer-Hoelter*, 602 F.3d at 1189 (eliding a causation requirement in its rule that "[m]unicipal liability may [] be based on the . . . ratification by [] final policymakers of the decisions—and the basis for them—of subordinates . . ."). This might be why sat least one circuit has suggested that the ratification theory eschews a causation requirement. *See Brooks v. Spiegel*, 2021 WL 4026728, at *5 (6th Cir. 2021) (arguing that *Meyers v. City of Cincinnati*, 14 F.3d 1115, 1117–19 (6th Cir. 1994) can be read to suggest that causation is not a necessary component of the ratification theory). On the other hand, imposing a causation requirement and effectively precluding liability based on post-hoc ratification might be precisely the goal. It would protect municipalities in cases, such as this one, where the only evidence of a municipal policy comes after the alleged incident. The Tenth Circuit's discussions in several ratification cases underscores that this is the favored approach in the Tenth Circuit. *See Jensen*, 968 F.3d at 1205 (holding that ratification existed when it was ongoing and occurred throughout the officer's conduct); *Thao v. Grady Cnty. Crim. Just. Auth.*, 159 F.4th 1214, 1227 (10th Cir. 2025) (implying that after establishing a policy or custom via ratification, a plaintiff must demonstrate the causation element); *Bryson*, 627 F.3d at 788 (same).

"stringent standard of fault," *Bd. Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997), is satisfied only if the Estate shows that "the City 'had actual or constructive notice that its action or failure to act was substantially certain to result in a constitutional violation' and 'consciously or deliberately chose to disregard the risk of harm,'" *Murphy*, 950 F.3d at 651 (quoting *Barney*, 143 F.3d at 1307).

Here, there is no genuine dispute over whether the City was deliberately indifferent to the training of its officers. The Estate has not put forth any evidence that the City had actual or constructive notice that its officer training was likely to result in the alleged violation of Decedent's Fourth Amendment rights, nor that the City consciously disregarded such risk, if it existed. The Complaint makes no allegations of a failure to train beyond bare recitals that "the City failed to properly train its officers in use of force" and "failed to adequately address training and supervision issues." **Compl. ¶ 47**. And the Estate's Response to City Defendants' Motion for Summary Judgment only puts forth the ratification theory, ***see*** **Doc. 53**, which is an independent source of a municipal policy or custom, not a way to prove a failure to train, *see Murphy*, 950 F.3d at 644 (citing *Hinton*, 997 F.2d at 782). In sum, the Estate has not put forth any evidence to raise a genuine dispute that the City failed to properly train its officers, never mind any evidence that any such failure was deliberately indifferent to Decedent's Fourth Amendment rights. Accordingly, there is no genuine dispute of material fact respecting a failure to train theory.

## II. Defendant Dominguez is not liable under § 1983 supervisory liability for Defendant Cosper's use of excessive force

Supervisory liability under § 1983 is not like respondeat superior liability—it may not be imposed based solely on the actions of the supervisor's subordinates. *Burke*, 935 F.3d at 997 (citing *Monell*, 436 U.S. at 691). Instead, to establish supervisory liability, a plaintiff must show that (1) the supervisor was personally involved, (2) the supervisor's actions caused the underlying

constitutional violation committed by his supervisee, and (3) the supervisor acted with deliberate indifference. *Burke*, 935 F.3d at 997.[17]

To establish a defendant's personal involvement, "the plaintiff 'must show an affirmative link between the supervisor and the constitutional violation.'" *Burke*, 935 F.3d at 997 (quoting *Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014)). In turn, "[t]he plaintiff can show such a link by establishing the supervisor promulgated, created, implemented, or possessed responsibility for the continued operation of a policy, or the establishment or utilization of an unconstitutional policy or custom, provided the policy or custom resulted in a violation of the plaintiff's constitutional rights." *Burke*, 935 F.3d at 997 (internal citations omitted).

Causation requires "the plaintiff to show that the defendant's alleged action(s) caused the constitutional violation by setting in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." *Burke*, 935 F.3d at 997 (quoting *Estate of Booker*, 745 F.3d at 435).

And deliberate indifference requires "proof that [the supervisor] disregarded a known or obvious consequence of his action." *Burke*, 935 F.3d at 997 (quoting *Brown*, 520 U.S. at 410). In other words, "a local government policymaker is deliberately indifferent when he 'deliberately' or 'consciously' fails to act when presented with an obvious risk of constitutional harm which will almost inevitably result in constitutional injury of the type experienced by the plaintiff."

[17] In its Response, the Estate claims that because Defendant Cosper's actions were "objectively unreasonable" and violated Decedent's constitutional rights, the supervisory liability claim survives City Defendants' Motion for Summary Judgment. *See* **Doc. 53 at 7–8**. Again, this confuses a necessary condition for a sufficient one. At this stage, there must be a genuine dispute not only that a constitutional violation occurred, but also that (1) the supervisor was personally involved, (2) his actions caused the underlying constitutional violation, and (3) that he acted with deliberate indifference. *Burke*, 935 F.3d at 997.

*Hollingsworth v. Hill*, 110 F.3d 733, 745 (10th Cir. 1997) (quoting *City of Canton*, 489 U.S. at 390).

Because the Estate has failed to raise a genuine dispute of material fact that Defendant Dominguez meets any of the three elements of § 1983 supervisory liability—never mind all three—the Court finds that Defendant Dominguez is not liable under § 1983 as a matter of law.

Neither the Complaint nor the Estate's Response to City Defendants' Motion for Summary Judgment makes any concrete allegation that Defendant Dominguez was personally involved with Defendant Cosper's alleged constitutional violation. ***See generally*** **Compl; Doc. 53**. Nor does either properly assert that he acted with deliberate indifference. The Complaint makes only naked conclusions that Defendant Dominguez "faile[d] to enforce LCPD policies and procedures regarding assisting mentally ill persons, engaging with non-English speakers, and use of force," failed to properly train Defendant Cosper, and "acted . . . with deliberate indifference in ensuring adequate use of force training, . . ." **Compl. ¶¶ 62–63**. The Response does not develop these arguments any further, apparently grounding its supervisory liability theory entirely on Defendant Dominguez's purported ratification. **Doc. 53 at 7–10**. But while the ratification theory may be grounds for finding a policy or custom that establishes *Monell* liability, it is not grounds for finding supervisory liability. *See generally* 1 Nahmod, *Civil Rights & Civil Liberties Litigation: The Law of Section 1983* §§ 3:92–3:114.

Accordingly, the Estate has failed to develop a supervisory liability argument and there is no genuine dispute over whether Defendant Dominguez is liable as Defendant Cosper's supervisor.

**III. City Defendants' Motion for Separate Trials is Moot**

Because the Court Grants City Defendants' Motion for Partial Summary Judgment, the only Defendant proceeding to trial is Defendant Cosper. Accordingly, City Defendants' Motion for Separate Trials is now Moot. ***See*** **Defs.' Mot. Separate Trials, Doc. 50**.

**CONCLUSION**

There is no genuine dispute of material fact, and summary judgment should be entered in City Defendants' favor. The Estate has failed to provide evidence showing a genuine dispute over whether there is municipal liability under either a ratification theory or a failure to train theory. And the Estate has also failed to show a genuine dispute of fact over whether Defendant Dominguez is liable under a § 1983 supervisory liability theory.

**IT IS THEREFORE ORDERED** that City Defendants' Motion for Partial Summary Judgment **(Doc. 48)** is hereby **GRANTED** and that City Defendants' Motion for Separate Trials **(Doc. 50)** is **DENIED AS MOOT**.

/S/
KEA W. RIGGS
UNITED STATES DISTRICT JUDGE